## In re LEE TONG.

### (*District Court, D. Oregon.* November 3, 1883.)

1. GAMING—ACT OF 1876 DEFINING.

    Section 1 of the act of 1876 (Sess. Laws, 39) includes not only the games therein enumerated, but also any game played for anything of value, with any device or means suitable and convenient for that purpose, and in which the game depends largely on chance, or more on chance than skill.

2. THE CHINESE GAME OF "TANTAN."

    This is a game of pure chance, and when played for anything of value constitutes gambling within the inhibition of said statute.

3. POWERS OF A MUNICIPAL CORPORATION.

    Apart from the few faculties incident to the existence of a municipal corporation, such as the capacity to sue and be sued, and have a common seal, it has no power to do any act except such as are essential to the plain purpose of its creation, or are authorized by the express provisions of its charter, or a clear or necessary implication therefrom.

4. POWER TO SUPPRESS WHEN NOT POWER TO PUNISH.

    A grant of power to a city "to suppress gaming and gambling houses," includes the power to suppress "gaming;" but when the crime of gaming is defined, and the punishment therefor prescribed by the law of the state, the city is not authorized to suppress any game not prohibited by such law, nor to punish any person playing thereat; but it is confined to the use of such means as may be within its power to enforce the state law within its limits.

5. Due Process of Law.

    A person arrested and imprisoned for the violation of a void ordinance of a municipal corporation is imprisoned by the state without due process of law, and therefore in violation of the fourteenth amendment, and may be discharged therefrom by the writ of *habeas corpus* issued from the proper court of the United States.

Petition for Writ of *Habeas Corpus*.

*Rufus Mallory* and *W. Scott Beebe,* for defendant.

*Ralph C. Dement,* for the city of Portland.

    DEADY, J. This is an application for a writ of *habeas corpus*, to deliver the prisoner, Lee Tong, from the custody of the chief of police of this city upon the ground that he is thereby deprived of his liberty without due process of law, and therefore contrary to the fourteenth amendment to the constitution of the United States. Notice was given of the application to the city attorney, who appeared and was heard against the petition. A stipulation as to the facts was made and filed by counsel, from which and the petition it appears that by section 37, subd. 5, of the act of October 24, 1882, (Sess. Laws, 151,) incorporating the city of Portland, "the council have power and authority" within the city "to suppress bawdy-houses, gaming and gambling houses, places kept for smoking opium and opium smoking, and to punish inmates of bawdy-houses, houses of ill-fame, keepers of places kept for smoking opium and opium smokers;" and that, in pursuance of the authority supposed to be thus conferred, the common council of the city of Portland, with the approval of the mayor, on August 24, 1883, passed ordinance numbered 3,911, and entitled "An ordinance to suppress gaming and gambling houses," which reads as follows:

    "Section 1. It is hereby forbidden and declared unlawful for any person, either as owner, proprietor, manager, employe, or lessee, or otherwise, to play, deal, set up, open, or cause to be opened, or carry on, or cause to be carried on, or permit to be or engage in any game of faro, monte, roulette, rouge-et-noir, rondo, twenty-one, poker, draw poker, bluff, brag, tantan or fan-tan, for or with anything of value, or for or with anything the representative of value, whether said games or any of them be played, dealt, set up, or carried on with cards, checks, or any other device, in any store, shop, building, hotel, or in any room, park, street, or public or private yard or place; and it shall be unlawful for any person to bet at or upon any such game or games; and any store, shop, or hotel, room, or building within which is played, dealt, opened, set up, or carried on any game mentioned in this section, is to be deemed a gaming and gambling house.

    "Sec. 2. Any person who shall be convicted of violating any provision of this ordinance shall be punished by imprisonment not exceeding ninety days, or by fine not exceeding $300, or both such fine and imprisonment."

    At the date of this ordinance it was made a crime by the law of the state (Sess. Laws 1876, p. 39) for any one to "deal, play, or carry on, open, or cause to be opened," or to "conduct, either as owner, proprietor, or employe," any of the games enumerated in said ordinance, except "tantan," or "any banking or other game played with

cards, dice, or any other device, whether the same be played for money, checks, or credits, or any other representative of value."

On August 29, 1883, a complaint in writing, duly verified, was made to the police judge of Portland, accusing the petitioner, by the name of John Doe, "with playing, setting up, and carrying on and engaging in gambling at tantan, on August 24, 1883, at Portland;" whereupon a warrant, reciting the substance of said complaint, was issued by said judge, directed to the chief of police, commanding him to arrest the said John Doe, and take him before said judge, "to be dealt with according to law;" and in obedience to said warrant said chief of police, on August 29, 1883, caused the petitioner to be arrested thereon, and now holds him in custody by virtue thereof, and without any other authority.

The power of this court to allow the writ and discharge the prisoner in case he is "in custody in violation of the constitution, or of a law or treaty of the United States," is given by sections 751–755 of the Revised Statutes. And if the petitioner is imprisoned without due process of law he is deprived of his liberty in violation of the fourteenth amendment, which provides that no "state shall deprive any person of life, liberty, or property without due process of law." *Parrot's Case*, 6 Sawy. 376; [S. C. 1 Fed. Rep. 481;] *In re Ah Lee*, Id. 410; [S. C. 5 Fed. Rep. 899.] The only question, then, open to dispute or consideration in the case is, is the petitioner restrained of his liberty without due process of law?

Counsel for petitioner insist that he is so restrained, because the ordinance under which the warrant issued for his arrest is void for want of power in the city to enact it. If the premise is admitted, the conclusion follows. A person imprisoned upon a warrant issued under a void law—a no law—is certainly deprived of his liberty without due process of law. And if such warrant is issued by a person deriving his authority from the state—as the police judge of Portland—such deprivation is, in contemplation of the constitution, the act of the state. *Ex parte Virginia*, 100 U. S. 346. But is the premise true? Is the ordinance void?

Counsel for the petitioner argues that this ordinance is not directed at "gambling-houses," but at gaming; and that the petitioner is in custody, not upon a charge of keeping a "gambling-house," but of "gambling at tantan;" that the word "gaming" in the clause "to suppress *gaming* and gambling houses," is there used as an adjective and not as a substantive, and therefore the clause does not give the city authority to suppress "gaming,"—at least directly,—but only to suppress gambling-*houses*—places kept for gaming; and if this is held otherwise, that the ordinance is nevertheless void, because the authority of the city to suppress "gaming" does not extend to any games but such as are made unlawful by the law of the state, and that "tantan" is not mentioned or included in the games enumerated and prohibited in section 1 of the act of 1876, *supra*, "to prevent and

punish gambling;" and therefore this ordinance for its suppression is void; and, further, that the power to suppress either gambling-houses or gaming does not authorize the passage of an ordinance providing for the punishment of persons who merely keep or play in such houses or at such games; but that the power of the city in this respect is limited to such measures as may be found necessary and convenient for the better enforcement, within its limits, of the law of the state defining the crimes of gaming and keeping a gambling-house, and prescribing the punishment therefor.

Assuming for the present that the word "gaming" is used in section 37 of the charter as a substantive, and not as an adjective, and that, therefore, the power of the council "to suppress" extends to gaming as well as keeping a gambling-house, does it include the game of "tantan?"

In *State* v. *Gitt Lee*, 6 Or. 426, the game played was evidently "tantan," but the court held the indictment insufficient, because it only alleged that the game was played "with copper devices for money as representatives of value;" in other words, that the copper devices were used to represent money, and were the stakes played for, instead of the device by means of which the game was played. At the same time the court (WATSON, J.) said that it was not essential that either the statute or the indictment should "give the name of the game or of the device by which it is played;" and that so much of section 1 of the act of 1875 as "prohibits ' any banking or any other game played with cards, dice, or any other device, whether the same be played for money, checks, credits, or' any other representative of value,' is sufficiently definite, and renders unlawful all games not previously enumerated in that section, and which are played for ' money, checks, credits, or any other representative of value,' with ' cards, dice, or other device.' "

Unlike the narrow, purblind ruling in *State* v. *Mann*, 2 Or. 238, by which section 666 of the Criminal Code was declared void for uncertainty, this opinion evidently assumes that laws against gaming should be construed with some reference to the nature of the subject, and with a view to make them effective. According to it "tantan," as described by counsel for the petitioner, and understood by the court, is prohibited and made criminal by section 1 of the act of 1875. It is a simple game of chance; something like "odd or even." The device by which it is played are little brass disks, called "cheen," about the size of a 20-cent piece, with a square hole in the center, in which the conductor of the game inserts a pointed stick for the purpose of conveniently and publicly moving them on the table as he draws them from the pile. He has probably two or three hundred of these near him. On the table when the game is played a small square is described, with its sides marked 1, 2, 3, 4. The player takes up at random a handful of the brasses and puts them on the table before him, and as he does so, covers them more or less with a hol-

low vessel, so that no one can tell what number is in the pile, or whether it is an odd or even one. The players then put down their money on the sides of the square, as they may fancy. When this is done the conductor uncovers the brasses and picks them out of the pile, four at a time, until only four or a less number are left. If the number left is an even one—either two or four—the player who put his money on this figure wins a like amount from the table, less a rebate of 7 per centum to the conductor, and the table wins what is laid on the other even number, while those who put their money on the odd numbers withdraw it. If the number of brasses left is an odd one—either one or three—that number wins and the process is reversed.

If this is a "device," within the statute, the game when played for money is gambling, within the same. The device mentioned in the statute is not cards, dice, or other "like" device, but simply "other" device. And if it were a "like" device, the question would arise: Like in what respect? like which of them? Cards and dice are in most respects very unlike—indeed, they have no resemblance, except that they may both be used for gaming. But then anything which may be used for that purpose is so far a like device. The coin of the realm, when used to play the games of "match," "heads or tails," "odd or even," for money or anything of value; a long and short straw, when used to play the game of "draw straws" for the same purpose; a "wheel of fortune" or a "grab-bag," when used at church fairs or festivals, or elsewhere, to dispose of articles of value, upon the chance of getting something for comparatively nothing,—are, each and all of them, so far, just as much gambling devices as cards or dice can be. In short, anything which is used as a means of playing for money or other thing of value, so that the result depends more largely on chance than skill, is so far a gambling device. Whart. Crim. Law, § 1465.

My conclusion is that the game of "tantan" is within the purview of the act of 1875, "to prevent and punish gaming;" and if the word "gaming" is used in the charter as a substantive, and not as an adjective merely qualifying "houses," then the council has the power to suppress it, as well as any of the games enumerated therein.

Whether the word is here used as an adjective or substantive is a nice question. In the decision of it a court ought not to lose sight of the object and the purpose of the statute, and the crying evil it was intended to prevent. My impression is that it is intended to be used as a substantive, and ought to be so construed. It is evident that there is as much propriety and necessity for giving the council power to suppress "gaming" as a "gambling-house." They are simply different phrases of the same evil—the one being an end and the other a means. And even if my impression were otherwise, in the absence of any final construction of the statute by the supreme

court of the state, I should hesitate, upon such a question as this, to say that the petitioner is imprisoned without due process of law, and discharge him therefrom in disregard of the state process under which he is held.

The sufficiency of the complaint and warrant of arrest in this case is also open to serious question. The name of the game is given, but nothing is said of the nature of the device or means with which it is played; nor is it alleged that the game was played for money or other thing of value, unless the allegation that the petitioner was engaged in "gambling" at tantan sufficiently implies that he was playing thereat for money. But whether these omissions render the proceedings null and void for want of jurisdiction in the court to issue the warrant, so that the petitioner is held without due process of law, or are only errors or irregularities for which the party must seek his remedy in the state courts, it is not necessary now to decide. *In re Ah Lee,* 6 Sawy. 416, [S. C. 5 FED. REP. 899,] and cases there cited.

The ordinance in question is entitled "An ordinance to suppress gaming and gambling houses." But it does not provide for the punishment of a keeper of a gambling-house as such, nor does it provide any means for suppressing gaming or gambling houses but by defining the crime and providing for the punishment for gaming "for or with anything of value" in Portland,—the games enumerated therein being only such as are enumerated in the state statute except "tantan," while the punishment therefor is increased to fine and imprisonment, instead of a fine only. It is also peculiar in that it not only prohibits the playing of any of the enumerated games *for* anything of value, but also *with* anything of value. While it can hardly be supposed that the council intended to make it a crime to play at a game merely for amusement, yet it seems that such is the effect of the ordinance in case the cards, dice, or other device with which it is played have any value.

But the question here is, does the power conferred by the charter on the council "to suppress" gaming, authorize it to define and punish the crime of gaming generally? By the original charter of October 14, 1864, (Sess. Laws, 10,) the provision in subdivision 5 of section 37 only authorized the council "to suppress bawdy-houses, gaming and gambling houses." The act has been amended or revised at every subsequent session of the legislature, except those of 1866 and 1878, for some purpose,—and generally to secure a change of officers,—but this clause has only been changed twice in that time. The act of October 26, 1880, (Sess. Laws, 99,) added the words, "and to punish inmates of bawdy-houses or houses of ill-fame;" while that of October 24, 1882, (Sess. Laws, 151,) added the provision for the suppression of places for smoking opium and opium smoking, and the punishment of opium smokers and the keepers of places for smoking opium, as already stated. There is no law of

this state for the punishment of an inmate of a bawdy-house, or of persons who smoke opium or keep places for that purpose; while there is provision made by such law (Or. Crim. Code, § 651; Sess. Laws 1876, pp. 39–41) for the punishment of a person who keeps a bawdy-house, or gambles, or keeps a gaming-house. From this it appears that the legislature expressly authorized the council (1) to simply suppress bawdy-houses, gaming and gambling houses; and (2) to suppress certain other acts and conduct, and also to punish any person who may engage therein.

The difference in the authority granted in the two classes of cases appears to be based upon the fact that the state had already provided for the punishment of persons engaged in the acts or conduct which the council is only authorized to suppress. Even if it be admitted that authority to suppress gambling-houses and gaming would empower the council to define and punish the crime of gaming, if the law of the state was silent on the subject, still when the general law of the state has defined the crime of gambling and keeping a gambling-house, and prescribed the punishment therefor, the power of the council to suppress must be exercised within those limits. The council cannot suppress a game that the general law has not prohibited; its power to suppress "gaming" must be understood as only applicable to games which the state has made illegal. Nor do I think it can suppress such games by prescribing a different or additional punishment therefor from that prescribed by the state. And this conclusion is, I think, deducible from general principles. But it is much strengthened in this case by the fact that the legislature has for so many years maintained the distinction in the charter between the power granted to the council to suppress and that to punish; the latter never being granted only in those cases where punishment was not provided in the general law. Under such circumstances there is no ground for the inference that the power to punish is implied in the power to suppress. The latter is not even necessary to the exercise of the former. The punishment provided by the state is sufficient, and if the council, under its authority to suppress, will endeavor by all the means in its power to enforce the state law within its limits, it will do as much to suppress gambling-houses and gaming as it could by endeavoring to enforce punishments prescribed by itself. And this conclusion is further fortified by the application of the rule for construing grants of legislative power to municipal corporations.

Apart from the few faculties considered incident to its existence, such as the capacity to sue and be sued, and have a common seal, a municipal corporation has no power to do any act except such as are essential to the plain purpose of its creation, or are authorized by the express provisions of its charter, or a clear or necessary implication therefrom. Dillon, Mun. Corp. § 89, (55;) Cooley, Const. Law, 194.

Under this rule, before it can be concluded that the power to pun-

ish persons for keeping gambling-houses and gaming is included in the power to suppress the same, it must clearly appear from the language of the grant, read by the light of the circumstances of the case, that such was the intention of the legislature. If there is a reasonable doubt about the implication of the power, it must be resolved against its exercise.

The only case directly in point, that has been cited, is *City of Mount Pleasant* v. *Breeze,* 11 Iowa, 399, in which it was held that a general grant of power to the city council "to suppress gambling," did not authorize it to pass an ordinance providing for the punishment of a person for keeping a "gambling device." Say the court: "The city council cannot *punish* that which they are only authorized to *suppress* under the general power."

My conclusion is that the council has no power to punish persons for gaming, and therefore the ordinance No. 3,911, and the proceedings under it for the arrest of the petitioner, are void. This being so he is restrained of his liberty without due process of law, in violation of the constitution of the United States, and is therefore entitled to the writ of *habeas corpus* for his deliverance.

———

Upon the delivery of this opinion the writ was issued, and the petitioner brought into court by the officer having him in custody, when it was agreed that the case should be formally submitted to the court upon the facts stated in the petition and stipulation aforesaid, without further argument; and thereupon it appearing that the prisoner is unlawfully restrained of his liberty, it was ordered that he be discharged therefrom, and go hence without day.

See *In re Brosnahan, ante,* 63, and note, 68.