## JAMISON v. WIMBISH, Superintendent.

### (District Court, W. D. Georgia, S. D.   June 28, 1904.)

**1. CRIMINAL LAW—SENTENCE.**

This case involves the legality of a sentence by a police magistrate for a petty municipal offense to a term at hard labor on a local chain gang.

**2. SAME—INFAMOUS CRIME.**

Whether or not a crime is infamous must depend upon the fact whether, by the statute defining it, an infamous punishment can be awarded. Mr. Justice Gray in Ex parte Wilson, 5 Sup. Ct. 935, 114 U. S. 417–447, 29 L. Ed. 89.

**3. SAME.**

An order of a police magistrate directing that a person shall serve a term in such a chain gang as that portrayed in the evidence is a sentence to infamous punishment.

**4. SAME.**

A city charter which authorizes its police judge to impose fines for the violation of any law or ordinance passed in accordance with its charter to an amount not to exceed $500; to imprison offenders in the city barracks for a space not more than 60 days, or at labor on the public works in the county chain gang for not more than 6 months; where it appears also that the persons convicted of minor municipal offenses are made to wear the typical striped clothing of the penitentiary convict; where iron manacles, which can only be removed by the use of the cold chisel, are riveted upon their legs; where the irons on each leg are connected by chains; where they work and sleep in the same clothing; where they wake, toil, rest, eat, and sleep in manacles and chains; where their progress to and from their work is public, and where they work on the public roads and before the public eye; where at all times they are watched with convict guards armed with deadly weapons, who will kill them if they attempt to escape; where they are liable to public and severe whipping by a whipping boss with a heavy leathern strap about two and a half or three feet long, with solid hand-grasp, and with broad, heavy, and flexible lash; and where they are imprisoned, work, and eat with felons from the State Penitentiary, and are only separated from them at night by a wooden lattice work—creates infamous punishment.

**5. CONSTITUTIONAL LAW—DUE PROCESS OF LAW.**

Due process of law in a criminal case requires a law describing the offense, the offense must be described in the accusation, the accused must be given his day in court, his trial must proceed according to established procedure, consisting of rules of pleading and practice, and it is imperative that the court be of competent jurisdiction.

**6. SAME—JURY TRIAL.**

While summary proceedings before municipal courts for the punishment of minor offenses against ordinances or by-laws can conclude with sentence of pecuniary fine, and, in default, with moderate imprisonment, or with both fine and imprisonment, under the American system the power to sentence for such offenses to hard labor on the public chain gang does not and cannot exist in the jurisdiction and procedure of police courts, where trial by jury is not a right of the accused.

**7. HABEAS CORPUS—FEDERAL JURISDICTION.**

While the courts and judges of the United States having discretion to grant the writ of habeas corpus should exercise that discretion in the light of the relations existing under our system of government between the judicial tribunals of the Union and the state, where the necessity of the writ is urgent, and where the proceeding against the prisoner is repugnant to the Constitution, the writ should be granted.

---

¶ 7. Jurisdiction of federal courts in habeas corpus proceedings, see note to In re Huse, 25 C. C. A. 4.

8. SAME—VOID SENTENCE.

Where a sentence is of that character that it is void for want of juris-
diction, habeas corpus will lie, and may be issued by any court or judge
invested with jurisdiction to grant it.

9. SAME—EVIDENCE.

Where a citizen of the United States has been sentenced by a single
judge of a police court for a minor municipal offense to seven months on
the chain gang described by the evidence in this case, and where, by state
law, should he sue out a writ of certiorari, he could not be discharged un-
less he was able to pay costs or give bond, and where he is not able to do
either, and his full punishment must have been suffered before, in the
ordinary course, his cause could have been heard and determined by the
state courts, and where it is alleged and proven that he is deprived of his
liberty in violation of the Constitution of the United States, it makes a
case for the urgent and immediate relief of habeas corpus at the hands
of a United States court.

(Syllabus by the Court.)

Alexander Akerman and Charles Akerman, for petitioner.
Minter Wimberley, City Atty., for respondent.

SPEER, District Judge. This is a petition for the great writ of
right—the writ of habeas corpus. It involves the legality of a sen-
tence by a police magistrate, for a petty municipal offense, to a term
at hard labor on one of those local chain gangs—perhaps the most
melancholy and distressing spectacle which afflicts the patriot and hu-
manitarian in many localities of our country. It involves the inquiry, is
such deplorable and degrading punishment, adjudged by such a court
for minor municipal offenses, tolerable under the American system?
It is believed that in no case previously decided by state or national
court has there been so fully and fairly made this inquiry, fraught
as it is with the misery of thousands of humble men, women, and
children, and fraught, also, with the hope of a possible return by local
governments to more humane methods, with the resultant uplifting of
millions of the people. Immediately, it involves the question whether
the recorder of Macon can, without any sort of criminal pleading,
and without the intervention of a jury, convict a citizen twice for one
violation of a minor municipal ordinance, and sentence him to seven
months at hard labor on the public chain gang; the punishment to be
suffered in a branch of the State Penitentiary. Here, also, is the
question, can it be maintained, in the light of the Constitution, that
one man, under any form of procedure, devised or to be devised by
local legislation, may consign men, women, and children to a chain
gang for such trivial offenses as are within the jurisdiction of a police
magistrate?

The petitioner, Henry Jamison, is a respectable colored man, between
fifty-five and sixty years of age. It appeared that he was working
for many of the reputable people of Macon in house cleaning, laying
carpets, and like work. On the night of the 13th day of March of this
year, he was arrested by two policemen of the city, carried immediately
to the city prison, and placed in a cell. The next morning he was
brought before the recorder. He was immediately put upon his trial
for certain offenses. The following entries taken from the docket of
the recorder's court constitute the entire record:

"Recorder's Docket, City of Macon.

"Date—March 14, 1904. No. case, 131. Arrested, March 13, 1904, 12:40 p. m.

"Case—Mayor and Council of the City of Macon vs. Henry Jamison, Drk Dis Con. Arresting officers, Mosely and Mitchell.

"Date—March 14, 1904. No. case, 133. Arrested, March 13, 1904.

"Case—Mayor and Council of the City of Macon vs. Henry Jamison. Offense, Dis Con in barrack. Arresting officer, Reddy."

He was immediately convicted, and an aggregate fine imposed of $60, and an alternative penalty for both cases of seven months at hard labor on the chain gang. For a poor day laborer like this man to pay a fine of $60 was wholly impossible. At noon the same day, he was sent to the chain gang, was at once clothed in the stripes of a convict, heavy iron manacles connected by a chain were riveted on each leg, and he was immediately put to work on the public road with other convicts from the recorder's and the city court, and from the State Penitentiary, at manual labor as severe, perhaps, as any of which the human frame is capable. He remained with the chain gang for five days, when the writ of habeas corpus was sued out in his behalf, and he was brought before this court.

The material averments of the petition are that the petitioner was arraigned in the recorder's court without any indictment, accusation, or written charge of any kind having been preferred against him, and without any form or semblance of a judicial trial he was sentenced to pay a fine, which he was wholly unable to pay, and then to serve a term of 210 days on the county chain gang of Bibb county. The petition further avers that the trial, sentence, and commitment were illegal and void, and that he was thereby deprived of his liberty and subjected to infamous punishment without due process of law. In further support of this averment, copies of what purport to be the judgment of conviction are annexed to the petition. These are brief printed blanks. The first reads as follows (Exhibit A):

"Recorder's Court—No. 131. Offense, drunk and disorderly, Macon, Ga., March 14, 1904. Mayor and Council of the City of Macon vs. Henry Jamison.

"On hearing the evidence in the above-stated case: It is ordered by the court that the defendant do pay a fine of twenty-five dollars or in default thereof be and is hereby committed to the county chain gang for and during the space of ninety days."

The second is termed "Exhibit B." It is as follows:

"Recorder's Court, Macon, Ga., March 14, 1904. Offense, disorderly conduct in the barrack. Mayor and Council of the City of Macon vs. Henry Jamison.

"On hearing the evidence in the above-stated case: It is ordered by the court that the defendant do pay a fine of thirty-five dollars and in default thereof be and he is hereby committed to the county chain gang for and during the space of 120 days to begin at the expiration of case No. 131.

"[Signed]                                    Custis Nottingham,
                                              "City Recorder."

It is observable that there is no finding of guilt or innocence by the recorder, and no finding of fact. It is a sentence, and nothing more. It is not, as seems to be supposed, insisted that an arrest by a policeman without warrant was invalid, and no such question is in the case.

Upon this petition the writ was issued, and served upon E. A. Wimbish, who is superintendent of the Bibb county chain gang. By the pay-

ment of $8,000 per annum to the city of Macon, the county commissioners purchase for their chain gang the convicts from the recorder's court, and are thus enabled to utilize their energies. The superintendent of the chain gang demurred to the petition on the grounds that the facts set forth were insufficient to give jurisdiction to this court, and, further, "that the petition fails to allege and show that the petitioner had exhausted or attempted to correct any alleged errors on the trial or in the commitment by appeal to the courts provided by law for the correction of the errors of the recorder's court." The answer of the respondent is, further, that he holds the petitioner by virtue of a commitment from the recorder's court; that the Bibb county chain gang is a chain gang duly established by the law of the state of Georgia; that Jamison was duly convicted; that the recorder's court of the city of Macon is a municipal or police court, duly organized by law, and authorized to try cases and inflict punishment for the violation of municipal law in a summary manner. He denies that the commitment is illegal and void, and that the petitioner is deprived of his liberty and subjected to an infamous punishment without due process of law, and in violation of the Constitution of the United States. The demurrer and the facts submitted on the answer and traverse thereto were heard and argued together.

To properly determine this case, it seems essential to inquire, in the first place, whether an order of the recorder directing that a person shall serve a term in the Bibb county chain gang is a sentence to infamous punishment. The law upon this subject is settled. In Ex parte Wilson, 114 U. S. 417, 447, 5 Sup. Ct. 935, 29 L. Ed. 89, Mr. Justice Gray, for the unanimous court, announced that whether or not a crime is infamous must depend upon the fact whether, by the statute defining it, an infamous punishment can be awarded. And said the learned justice (page 428, 114 U. S., page 940, 5 Sup. Ct.):

"For more than a century, imprisonment at hard labor in the State Prison or Penitentiary, or other similar institution, has been considered an infamous punishment in England and America."

Justice Gray continues:

"Among the punishments 'that consist principally in the ignominy,' Sir William Blackstone classes 'hard labor in the house of correction or otherwise,' as well as whipping, the pillory, or the stocks. 4 Blackstone's Commentaries, p. 377. And Mr. Dane, while treating it as doubtful whether confinement in the stocks or in the house of correction is infamous, says 'punishments clearly infamous are death, gallows, pillory, branding, whipping, confinement to hard labor, and cropping.' 2 Dane's Abridgment, 569, 570."

This decision was rendered in 1884, and from it there has been no judicial departure. 10 Rose's Notes on U. S. Supreme Court Reports, 1074 et seq. It is perhaps not inappropriate at this point to recall the fact that this salutary doctrine of constitutional law has been of service to the people of this district. It was formerly the practice to prosecute illicit distilling and other violations of the internal revenue laws by information. In view of the ease with which such charges were presented, and the profits flowing therefrom to informers and others, frivolous prosecutions were multiplied, and great inconvenience, and, indeed, oppression, were experienced by the rural population. This was averted by the decision in this court in United States v. Johanssen (C. C.) 35 Fed. 407–414. Adopting the definition of an "infamous

punishment" as expressed in Ex parte Wilson, supra, and calling attention to the liberalizing and humane tendencies of the law as advanced by the progressive steps of our Supreme Court, we announced that "hereafter the courts of the United States of this district will take no action in the large class of cases involved, save after the presentment or indictment by the grand jury." The forecast of the effect of the decision made in the opinion has been justified by the event:

"That crime is rare; that the impartial and law-respecting investigations of the grand juries would bring to the bar of justice the willful lawbreaker, but would in all likelihood discountenance the sinister and malevolent informer, who has used the powers of the government to purvey to his malice, or to his greed for the perquisites of the witness for the prosecution."

All of this has proven true. Thus it will be seen that the enforcement of a constitutional principle which in one case deprives the municipal authorities of the profits which arise from involuntary and unpaid servitude, imposed, not for crime, but for peccadillos, on another occasion, and for 14 years since then, becomes the salutary and effective defense of the rights and the peace of the people.

The most cursory view of the evidence in the record will convince the impartial that practically every ignominious mark of infamous punishment is stamped upon the miserable throng in Bibb county chain gang. This is clear from the testimony of the superintendent, E. A. Wimbish, and from the uncontradicted evidence of witnesses who have there expiated their disregard of sundry provisions of the city code. The sufferers wear the typical striped clothing of the penitentiary convict. Iron manacles are riveted upon their legs. These can be removed only by the use of the cold chisel. The irons on each leg are connected by chains. The coarse stripes, thick with the dust and grime of long, torrid days of a semitropical summer, or incrusted with the icy mud of winter, are their sleeping clothes when they throw themselves on their pallets or straw in the common stockades at night. They wake, toil, rest, eat, and sleep, to the never-ceasing clanking of the manacles and chains of this involuntary slavery. Their progress to and from their work is public, and from dawn to dark, with brief intermission, they toil on the public roads and before the public eye. About them, as they sleep, journey, and labor, watch the convict guards, armed with rifle and shotgun. This is to at once make escape impossible, and to make sure the swift thudding of the picks and the rapid flight of the shovels shall never cease. If the guards would hesitate to promptly kill one sentenced for petty violations of city law should he attempt to escape, the evidence does not disclose the fact.[1] And the fact more baleful and more ignominious than all—with each gang stands the whipping boss, with the badge of his authority. This the evidence discloses to be a heavy leathern strap, about 2½ or 3 feet long, with solid hand grasp, and with broad, heavy, and flexible lash. From the evidence, we may judge that the agony inflicted by this im-

[1] To show the fierce vigilance of the guard, on the day this case was argued a number of felons from the State Penitentiary, who by state law are brigaded with those convicted by the recorder for minor municipal offenses, attempted to escape from the chain gang described. Three were shot down, all desperately wounded. One will probably die, and, if he lives, will be a paralytic for life, as it is stated that the buckshot penetrated the vertebræ.

plement of torture is not surpassed by the Russian knout, the synonym the world around for merciless corporal punishment. If we may also accept the uncontradicted evidence of the witnesses, it is true that on the Bibb county chain gang for no day is the strap wholly idle, and not infrequently it is fiercely active. One witness, who served many months, testified that if the gang does not work like "fighting fire," to use his simile, the whipping boss runs down the line, striking with apparent indiscrimination the convicts' as they bend to their tasks. Often the whipping is more prolonged and deliberate. At times, according to another witness, also uncontradicted, the convicts, when at the stockade, are called into the "dog lot." All present, the whipping boss selects the victims in his judgment worthy of punishment. They are called to the stable door, made to lie face downward across the sill, a strong convict holds down the head and shoulders, and the boss lays on the lash on the naked body until he thinks the sufferer has been whipped enough. It is but just to Mr. Wimbish to record his statement that he knew nothing of this ceremony. It may be judged from the evidence that it is a whipping more formal and dramatic than any other inflicted. Since this is done at the stockade, we may presume that the convicts and guards are the only witnesses; but on the public roads, in the presence of wayfarers and bystanders, often the convict, to use an expression of a witness, "is taken down and whipped." The evidence gives us the account of two white persons who were thus whipped—one, a boy with but one arm. For this reason, it was not necessary to hold him. He stood and cried as the boss applied the lash. The other white boy was compelled to place his head between the legs of a burly negro convict, and was thus immovably held. The punishment will mark the lad with infamy in the minds of his fellows as long as he may live. The offense of one of these lads was "loitering in the depot." Nor does the recorder sentence to this punishment men who commit crimes against the laws of the state. By explicit decisions of the state courts, this official has no jurisdiction to sentence, but must commit such offenders to the appropriate state court for jury trial. The punishment here described is inflicted upon those who are convicted of minor municipal offenses, such as disorderly conduct, violations of the bicycle ordinances, walking or standing on the park grass, loitering in the depot or in the railroad yard, careless driving, and the like.

It is obvious that discipline for all prisoners is necessary. While we may deplore the fact that more humane methods are not adopted, that is not the question. The question is this: Can the recorder, under the American Constitution, without jury trial and due process of law, sentence to such punishment? It is, moreover, true that the Bibb county chain gang is a branch of the State Penitentiary. The "State Penitentiary," as the term is generally understood, is no longer utilized. The state has a "prison commission," but no "State Prison." Its penitentiary consists of its felony convicts. None of these are directly worked by the state. The prison commission has supervision alike of these felons and the county chain gangs. The act of the General Assembly approved August 17, 1903, provides that the several counties of the state shall have the right, at their option, to work and use convicts sentenced to the penitentiary for period of five years or

less on the public roads or public works. It requires the prison commission to make a just apportionment of all the felony convicts of this class among the several counties of the state on the basis of their general population as shown by the United States census. The felons from the penitentiary, thus used, work on the county chain gangs. It appears from the evidence of Mr. Wimbish, the superintendent of the Bibb county chain gang, that the Bibb county commissioners promptly availed themselves of the opportunities afforded by the legislation to distribute these felons among the several counties of the state. Forty-six of these men sentenced to the Georgia penitentiary are now in the Bibb county chain gang. At night they are separated from the convicts from the recorder's court by a wooden latticework. In the day these criminals of the most desperate character, from all parts of the state, work indiscriminately with the men, women, and children sentenced from the recorder's court for the petty offenses of which he has jurisdiction. It cannot be said, however, that the convicts of the recorder have the rights under the law afforded the felons. One guilty of burglary, arson, manslaughter, or any crime on the calendar, however heinous, has been accorded a copy of the accusation against him, trial by jury, the opportunity to appeal—in short, due process of law. Not so with the lad who loiters on the streets or is overcome by sleep in the depot. Not so with the licensed barber who turns over his chair to a brother, but unlicensed, artist during his temporary absence from the shop. To the same branch of the penitentiary they may swiftly go.

The docket of the recorder's court was in evidence, and literal extracts therefrom made pending the trial will be added as an exhibit to this opinion. From this, the sole record, it appears that during the month of March, 1904, alone, 149 persons were convicted by the recorder for violations of municipal ordinances. Upon these people there were imposed sentences amounting to 6,751 days, or a possible aggregate to the people of nearly 19 years of the misery and degradation of the Bibb county chain gang. The principal authority for this vigorous scheme of municipal penology is section 59 of the charter of the city of Macon (Laws Ga. 1893, p. 257). This provides that the recorder of said city "shall have the power to impose fines for the violation of any law or ordinance of the city of Macon passed in accordance with its charter, to an amount not to exceed $500, to imprison offenders in the city barracks for a space of not more than sixty days, or at labor on the public works in the county chain gang for not more than six months." Neither the charter of Macon, nor any other enactment by the state, makes any provision for a trial by jury in this court. It is, of course, clear, and from settled authority, that municipal laws made under a charter from the state must be regarded as the laws of the state, and, further, that an officer like the recorder, appointed under such charter, must be regarded as an officer of the state. His acts are the acts of the state, and the Constitution provides, "Nor shall any state deprive any person of life, liberty or property without due process of law."

It is contended by the learned city attorney that one sentenced by virtue of this provision of the charter ought not to complain that he is deprived of liberty without due process of law, for the reason

that this provision was enacted by the General Assembly, and is therefore the law of the land. This seems rotary or circumferent reasoning, and the gifted logician seems to emerge from the circle at the point where he entered. It is for the reason that the state, by legislation, has made one of its agents—a recorder without a record, a criminal judge of a court without criminal pleading—a tribunal in which one man is intrusted by the state with practically arbitrary power to impose cruel and infamous punishment for offenses the most trivial, that the jurisdiction of the United States court empowered to protect the constitutional rights of the citizen is invoked. Said Mr. Justice Matthews, in rendering the majority opinion in Hurtado v. California, 110 U. S. 535, 4 Sup. Ct. 111, 28 L. Ed. 232:

"While conceding that each state prescribes its own modes of judicial proceeding, it is not to be supposed. that these legislative powers are absolute and despotic, and that the amendment prescribing due process of law is to become indefinite, and not operate as a practical restraint. It is not every act of legislation in form that is law. Law is something more than mere will exerted as an act of power. In the language of Mr. Webster in his famous definition, 'It is the general law, the law which hears before it condemns, which proceeds upon inquiry and renders judgment after trial, so that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society.' "

While the definitions of the term "due process of law" are varied, and while, perhaps, none of them are sufficiently elastic and flexible to expressly anticipate and defeat the multiform methods by which those "drest in a little brief authority" assail the liberties and immunities of the individual, yet the requirements of this essential to distributive justice are familiar to every mind. In that valuable publication, the American & English Encyclopædia of Law (2d Ed., vol. 10, p. 303), a sufficient statement may be found:

"Due process of law, in a criminal case, requires a law describing the offense. The offense must be described in the accusation. The accused must be given his day in court. His trial must proceed according to established procedure, consisting of rules of pleading and practice."

It may be added that it is imperative that the court be of competent jurisdiction.

It is obvious that all procedure in courts created or authorized by the state must be authorized by state law. So long as the enactments to this end do not deny or violate the fundamental essentials of the Constitution, ordained for the establishment of justice and the perpetuation of liberty by the people of the United States, no interference therewith is appropriate or to be tolerated. "When, however," said Prof. Guthrie in his interesting work on the Fourteenth Amendment, pp. 104, 105, "the statute clearly invades some substantive right, or when a statute harmless on its face is systematically enforced in violation of fundamental rights, or when the court, transgressing its functions, attempts to render judgment without jurisdiction of the subject-matter or notice to the parties, the procedure is not due process of law, and may be declared void and set aside by the courts under the jurisdiction conferred by the fourteenth amendment."

It is not questioned that the summary proceedings before municipal courts for the punishment of minor offenses against ordi-

nances or by-laws can conclude with sentence of pecuniary fine, and, in default of payment, with moderate imprisonment, or with both fine and imprisonment. Sir William Blackstone, in his Commentaries, 4th book, par. 228, states:

"Another branch of summary proceedings is that before justices of the peace in order to inflict divers petty pecuniary mulcts and corporal penalties denounced by acts of Parliament for many disorderly offenses, such as common swearing, drunkenness, vagrancy, idleness, and a vast variety of others."

And the famous commentator cites certain evil consequences of this jurisdiction, which we forbear to mention. But he concludes in this language:

"From these ill consequences we may collect the prudent foresight of our ancient lawgivers, who suffered neither property nor the punishment of the subject to be determined by the opinion of any one or two men, and we may also observe the necessity of not deviating any farther from our ancient constitution by ordaining new penalties to be inflicted upon summary convictions."

The jurisdiction of the justices of the peace in England at the time of these authoritative declarations of that great writer and judge, who "found the English law a skeleton, and who clothed it with life and beauty," is practically equivalent to that of a police magistrate in our own times. Unhappily, we witness in the recorder's court in Macon the punishment of the citizens determined by the opinion of one man, and the punishment for such offenses as novel and unprecedented as it is ignominious and cruel.

The act of the General Assembly of Georgia attempting to bestow the power on the recorder of Macon is the only statute to which attention has been called by which those convicted of minor offenses can be sentenced by a police court to confinement and hard labor on the chain gang. By the charter of Atlanta, the police court may inflict a fine of $500, or 30 days' imprisonment, or work on the public works. In Augusta the maximum fine is $300, and the maximum imprisonment or labor on the public works 90 days. In Rome, Athens, and Columbus, "labor on the public works" is the term used in designating the punishment. While it may be true, as insisted in the argument, that the Macon chain gang, in management, discipline, and punishment, is not more than an equivalent for the management of "public works" elsewhere, yet the framers of the charters mentioned, perhaps with laudable respect for the opinions of mankind, seemed to have blinked the use of the word. Indeed, it may be with entire accuracy declared that the voluminous and exhaustive preparation of the city attorney and the subsequent examination by the court have evoked no shred of authority, either American or English, where a sentence for petty offenses by a police magistrate to a public chain gang, with the ignominious accessories of fetters, the stripes, lash, and of the degradation of convict life, has been sustained or even palliated. Under the American system, the chain gang has no place in the jurisdiction and procedure of police courts, where trial by jury is not a right of the accused. How abhorrent would be such a punishment in such cases to those great American jurists whose finding is ultimate determination, we may judge from Callan v. Wilson, 127 U. S. 540, 8 Sup. Ct. 1301, 32 L. Ed. 223. In denouncing a convic-

tion in a police court of the District of Columbia, Justice Harlan said:

"The jurisdiction of the police court, as defined by existing statute, does not extend to the trial of infamous crimes, or offenses punishable by imprisonment in the penitentiary."

And this for the reason that there was no provision for jury trial.

Finally it is urged that a court of the United States may not, by judgment upon habeas corpus, afford relief to the citizen who is deprived of his liberty even by a colorable order from a police court of the state, and though the court is without jurisdiction, its order void, and its sentence to infamous punishment so severe that, if the petitioner can survive, it will probably exhaust the last resource of nature. This contention does not seem marked by any considerable merit. So valuable is deemed this great remedy, that the Constitution itself provides that "the privilege of the writ of habeas corpus shall not be suspended, unless when in case of rebellion or invasion the public safety may require it." Sections 751, 752, and 753 of the Revised Statutes [U. S. Comp. St. 1901, p. 592] provide that the Supreme Court, Circuit and District Courts, and the several justices and judges of said courts within their respective jurisdictions, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty. It is true that it is provided that the writ shall not extend to a prisoner who is in custody by a state court unless that custody is in violation of the Constitution or of a law or treaty of the United States. This topic is thoroughly discussed in the opinion of Mr. Justice Harlan, for the unanimous court, in Ex parte Royal, 117 U. S. 245, 6 Sup. Ct. 734, 29 L. Ed. 868. From this decision, which has never been departed from, the law is clearly deducible that the courts and judicial officers of the United States named in the habeas corpus enactments shall not have power to award the writ to any prisoner in jail, or, we may add, in confinement by constituted authorities, except in the specified cases, and most important of these is where he is alleged to be held in custody in violation of the Constitution of the United States. Cases of this latter class are expressly provided for by the act of Congress of February 5, 1867, c. 28, 14 Stat. 385. This declares that the several courts of the United States, and the several justices and judges thereof, within their respective jurisdictions, in addition to the authority they have conferred by law, shall have power to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty in violation of the Constitution or of any treaty or law of the United States. The power, therefore, in the court to grant the writ, by statute and authority, is complete.

It is true that it has been held in Ex parte Royal and in many other cases that, the United States court having discretion to grant the writ, that discretion should be exercised in the light of the relations existing under our system of government between the judicial tribunals of the Union and of the states. It has been further held that the discretion should be subordinated to the special circumstances in each case, and that where the state court has jurisdiction the writ should generally not be granted unless the necessity

is urgent. In view of these settled principles, in a multitude of cases the Supreme Court and the other United States courts have refused to award the writ. But as in the Royal Case, it was always held that, if the proceeding against the prisoner was repugnant to the Constitution, the prosecution against him had nothing upon which to rest, and the entire proceeding was a nullity. It was said in Ex parte Siebold, 100 U. S. 371–376, 25 L. Ed. 717, that an unconstitutional law is void, and is as no law; a conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal case of imprisonment. Adverting to the argument which was made here, that, where a defendant has been regularly tried and convicted in a state court, his only remedy was to carry the judgment to the state court of last resort, and hence by writ of error to the Supreme Court, Mr. Justice Bradley, in Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872, declared:

"This might be so if the proceeding in the state court was merely erroneous, but, where it is void for want of jurisdiction, habeas corpus will lie, and may be issued by any court or judge invested with supervisory jurisdiction in such case."

The wealth of authority upon this subject is very great. It is believed that every pertinent case has been examined, and while, in rare cases, decisions of the Circuit or District Courts have been reversed by the Supreme Court for error in the determination of the cause itself, no case has been found wherein there is a disapproval of the action of such courts for awarding the writ of habeas corpus where it is fully averred and shown that the petitioner is held in custody in violation of the Constitution and laws of the United States. On the other hand, there are many precedents where the decisions of such courts have been affirmed for granting the writ and discharging the prisoner under averments that he has been deprived of his liberty in violation of those fundamental rights and immunities secured to him by the Constitution and laws of our common country. A case precisely in point is In re Mills, 135 U. S. 263, 10 Sup. Ct. 762, 34 L. Ed. 107. In that case the proper punishment might have been imprisonment, but a District Court of the United States sentenced the prisoner to imprisonment in the penitentiary. Holding that such imprisonment was infamous, with or without hard labor, the Supreme Court held that the court below was without jurisdiction to pass any such sentence, and the orders directing sentence of imprisonment to be executed were void. A fortiori would such judgment from a police court be annulled. This, it was declared, is not a case of mere error, but one in which the court below transcended its powers; citing Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872; Ex parte Parks, 93 U. S. 18, 23 L. Ed. 787; Ex parte Virginia, 100 U. S. 339–343, 25 L. Ed. 676; Ex parte Rowland, 104 U. S. 604, 26 L. Ed. 661; In re Coy, 127 U. S. 731, 8 Sup. Ct. 1263, 32 L. Ed. 274; In re Hans Nielsen, 131 U. S. 176, 9 Sup. Ct. 672, 33 L. Ed. 118.

The aggressions of municipal corporations upon the rights and liberties of the citizens, declared by competent observers to be at once the most vicious feature of our present social condition and the most alarming portent of our future, have thrust a multitude of unconstitutional ordinances before the courts of the United States.

This has occasioned much shrilling and no little objurations from the local interest from time to time affected, but, happily for the people, the courts steadily proceed with the exercise of their constitutional powers. In Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, it was held that, in a suit brought before the Supreme Court from a state court which involved the constitutionality of ordinances made by municipal corporations in the state, the United States court will, when necessary, put its own independent construction upon such ordinances. The same elevated tribunal remarks in the same case:

"Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so practically as to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, and denial of equal justice, it is still within the prohibition of the Constitution."

See, also, Ex parte Lee Tong (D. C.) 18 Fed. 253; The Laundry License Case (D. C.) 22 Fed. 701; In re Tie Loy (C. C.) 26 Fed. 511; Ex parte Ah Jow (C. C.) 29 Fed. 181. In all of these cases persons convicted in the state court without due process of the law were released by habeas corpus for the reason that the conviction was violative of the fourteenth amendment to the Constitution of the United States.

It is, moreover, true that, in the extended examination herein made, no case has been found which approaches that of the petitioner in strong appeal to the court for the urgent, immediate, and effective relief of habeas corpus. A respectable man, past middle life, accustomed to indoor work requiring no physical exertion, is arrested at night, on his way home, and hurried to the cells of the city prison. The next morning, without accusation of any sort, he is sentenced to pay fines impossible of payment, and the alternative punishment—because of its infamy violative of the Constitution—for seven months on the chain gang is at once imposed. By noon, in stripes and shackles, in easy range of the repeating rifles and shotguns of the guards, this man is toiling on the public roads with the frantic energy of one who works under fear of death, or of punishment to which, in the mind of a vast majority of men, death itself would be preferable. Before him are 210 days of agony, 210 nights in a fetid stockade. That he is unable to give the bond, he testifies. Could he appeal? An appeal to the courts of the state would have brought him no relief. His complaint involved the legality of the great majority of the convictions by the recorder's court, and, in large measures, the authority and jurisdiction of the court itself. Opposed to him was a powerful organization, with all of its active and potent agencies. Well might he and his counsel conclude that, had appeal been made to the state courts by certiorari or otherwise, it would have been resisted, as it is resisted here, to the court of final appeal. In the meantime, from March until October, through the deadliest months of a semitropical climate, with unceasing toiling in the summer sun, his suffering and wretchedness, his danger and infamy, would never cease. It seems that he might apply for writ of certiorari to the judge of the superior court. Acts Gen. Assem. 1902, p. 105, c. 70. Could he have given bond and paid the costs, that judicial officer might, in his discre-

tion, have superseded the judgment of conviction. But the local lawmaker, keenly appreciative of the value of a poor man's labor, stipulates that in such appeals, if unable to pay costs or give bond, the prisoner shall not be discharged. Then it is true that before his cause, with all of its importance, could have been heard, had the petitioner survived, the punishment would have been suffered, and the judgment on appeal would have been worthless, even had he prevailed. Besides, the sentence against him is void. Void for want of due process of law. Void because one man cannot adjudge infamy. Like thousands of the oppressed and down-trodden, through all the centuries since that glorious day in the history of human liberty when the Great Charter made forever imperishable the principle that "no free man may be taken or imprisoned, but by the lawful judgment of his peers or by the law of the land," he applies for the great writ of right, the writ of habeas corpus; and he humbly seeks the portals of that court whose judges are sworn to know no difference between the rich and the poor, where justice ever bends the listening ear to catch the plaint of the humble and the lowly, and through all whose generous and benign jurisprudence is heeded the admonition of the Master, "Inasmuch as ye have done it to one of the least of these my brethren, ye have done it unto me." If the prayer of this man must be denied, then the statutes authorizing the United States courts and the judges thereof to issue the writ of habeas corpus to protect the rights of the citizen guarantied by the national Constitution have at last been successfully nullified, and hereafter the petitioner in like case must have recourse alone to the courts of the state.

Not a little has been said in the argument to the effect that the majority of those who are sentenced to this chain gang merit all the punishment they receive. One witness, formerly a road commissioner, who was familiar with the operations on the chain gang, testified that, in his opinion, while a sentence there would forever ruin a white man previously respectable, it had no such effect on a respectable negro. Such considerations do not appeal to a court charged with the equal enforcement of the law. Nor do I believe that they meet the approbation of the reflecting people of the Southern states. Nor are such sentiments conducive to our welfare or hopeful for our future. Twenty-one years ago, when at the bar, in an argument to a jury, in the great case of Ex parte Yarborough, I declared the conviction that:

"Never in the history of the world has any considerable class of people been debased and degraded by force and lawlessness, but that the entire people suffered because of that degradation. The white people of this country control the government, state and federal. They enjoy every conceivable advantage. They have superiority in wealth, education, social influence, everything. A magnanimous people, a just people, they owe it to themselves to be magnanimous and just to the colored people."

It was true then. It is true now. I further declared:

"For my part, I love my country. I am proud of its traditions. I glory in the heroism and manhood of its people. I know that they despise cruelty and barbarity to the helpless and oppressed."

This was true then. It is true now. Though the color-line expert may so paint it, this is no color-line case. It is a negro to-day.

It may be a white man—aye, a white child or a white woman—to-morrow. In this court the law is equal for all.

Judgment absolute will be ordered in favor of the petitioner, and he will be discharged from custody and be permitted to go hence.