# CITY OF ST. PAUL v. MARSHALL STOVALL.[1]

January 16, 1948.

No. 34,432.

*John Edmund Burke* and *Edward K. Delaney,* for appellant.

*Bruce J. Broady,* Corporation Counsel, and *John J. McNeil,* Assistant Corporation Counsel, for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment of conviction of the municipal court of St. Paul finding defendant guilty of possession of gambling devices in violation of an ordinance.

Defendant was arrested without a warrant on June 15, 1946, at his home in St. Paul. On June 17, 1946, a complaint was filed charging that he "did wrongfully, unlawfully, and wilfully have in his possession at 411 Rondo Avenue, gambling devices, to-wit, one dream book, a daily tally book, and 36 sheets of bets placed, known as 'Policy,' in violation of the charter and ordinances of said City,

---

[1]Reported in 30 N. W. (2d) 638.

and against the peace and dignity of the state of Minnesota." The case was tried on January 3, 1947, before the court without a jury. Defendant was found guilty and ordered to pay a fine of $100, or, in default thereof, to serve 30 days in the workhouse.

The principal questions involved are:

(1) Did the court have jurisdiction, in view of the arrest of defendant without a warrant and after a search of his home without a search warrant, in a misdemeanor case?

(2) Was the evidence sufficient to establish that the city's exhibits constituted gambling devices as of June 15, 1946?

(3) Was the evidence sufficient to convict defendant of possession of gambling devices?

■ During the proceedings, defendant's counsel objected to the proceedings on the ground that the arrest was made without a warrant and that the evidence used in support of the complaint was obtained illegally. Upon appeal, defendant argued that the municipal court was without jurisdiction because the arrest was illegal. It is conceded that the arrest was made without a warrant. M. S. A. 629.34 provides that a peace officer may, without a warrant, arrest a person for a public offense committed or attempted in his presence. Other instances where an arrest without a warrant is permitted relate to felonies and need not be considered here.

We cannot say that the facts here show the arrest to have been illegal. Two police officers went to the neighborhood of defendant's residence about ten o'clock in the morning of June 15, 1946. They watched his house from a distance for about an hour and saw quite a few people—estimated at between 15 and 20—going into the house. About one o'clock that afternoon, policemen William C. Schmidt, who had observed the place in the morning, and George C. Failes were sent to defendant's house by their superior officer. Failes testified that when they knocked on the door and asked the woman who answered for the occupant of the first floor she called defendant, who let them in. Failes said that they "told him [defendant] what the complaint was" and that "He denied at that time that there was

any policy writing in his place, invited us to look around." He further testified that defendant said, "We haven't done anything since you warned us the last time." Officer Schmidt, who was with him, testified to substantially the same effect. Both officers stated that after they got into the house defendant invited them to look around, and that while looking around in the dining room officer Failes found certain paraphernalia claimed to be gambling devices, hereinafter referred to as exhibits B, C, and D, in a writing desk. Defendant claimed that when the woman who answered the door called him the officers were coming into the hallway of his home. He said that they were in plain clothes and that he did not know who they were. With reference to the search made by the officers, defendant testified:

"Q. Did you attempt to stop him from searching the place?

"A. No, he went all over the house. He said I am going to look around. That is what he says to me. He says I am going to look around.

"Q. Did you tell him he couldn't search the drawers and things?

"A. No.

"Q. Did you try to stop him in any way?

"A. I didn't try to stop him in any way."

Defendant was taken to headquarters that day by the officers after they found the paraphernalia in the writing desk, and bail was posted.

Even where an arrest is illegal, the court before whom the defendant is brought for trial has jurisdiction to proceed in the case. In State v. Volk, 144 Minn. 223, 225, 174 N. W. 883, 884, Mr. Justice Holt quoted with approval Commonwealth v. Tay, 170 Mass. 192, 193, 48 N. E. 1086, where it was stated:

"* * * If she [the defendant] was illegally arrested, she had her remedy by action for that wrong, and the illegal arrest did not prevent the court from acquiring jurisdiction to try the complaint."

In State v. Nugent, 108 Minn. 267, 121 N. W. 898, while the fact situation was not exactly the same as in the case at bar, it was held

that the court had jurisdiction of the subject matter of the action and of the person of the defendant. There, the defendant was convicted in municipal court for violation of an ordinance of the city of Minneapolis prohibiting the sale of intoxicating liquor to minors. No warrant was issued for his arrest, but upon complaint being filed against him he voluntarily appeared in person and pleaded not guilty, and his trial proceeded without objection. See, also, State ex rel. Brown v. Fitzgerald, 51 Minn. 534, 53 N. W. 799.

While it is true in the instant case that defendant, through his counsel, made timely objection to the proceedings on the ground that the arrest was made without a warrant and that the evidence used in support of the complaint was obtained illegally, we believe that under the facts and circumstances of the case as they appear from the record there was no reversible error with reference to the jurisdiction of the court. Neither can we hold that the evidence used in support of the complaint was obtained illegally, since it appears from the record that defendant waived any rights which he might have had when he permitted the officers to enter his home and "look around" without a search warrant, as he admits himself that he did not try to stop them in any way. As stated in De Lapp v. United States (8 Cir.) 53 F. (2d) 627:

"* * * It is well established that consent of the accused to a search of his premises operates as a waiver of the right to assert that the same was unreasonable, and under such circumstances there is no need of a search warrant."

See, also, Waxman v. United States (9 Cir.) 12 F. (2d) 775; Schutte v. United States (6 Cir.) 21 F. (2d) 830; Poetter v. United States (9 Cir.) 31 F. (2d) 438. In State v. Siporen, 215 Minn. 438, 10 N. W. (2d) 353, it was held that evidence obtained by search and seizure was admissible even though the search was unlawful. To the same effect, see State v. Ryan, 156 Minn. 186, 194 N. W. 396; State v. Kaasa, 198 Minn. 181, 269 N. W. 365; State v. Denner, 159 Minn. 189, 198 N. W. 430; City of Mankato v. Grabowenski, 154 Minn. 265, 191 N. W. 603; State v. Sauer, 217 Minn. 591, 15 N. W.

(2d) 17; State v. Rogne, 115 Minn. 204, 132 N. W. 5; State v. Pluth, 157 Minn. 145, 195 N. W. 789.

We do not approve or condone any laxity on the part of public officers in making arrests or searches without warrants when the facts and circumstances make it possible for them to be equipped with the proper legal documents. We recognize, however, as stated in State v. Olson, 115 Minn. 153, 155, 131 N. W. 1084, 1085, that—

"* * * The police courts of our large cities are often daily confronted with large numbers of petty offenders, and it would be intolerable to require that their proceedings be in form those prescribed for higher courts and higher offenses. Their proceedings must of necessity be more or less summary and informal, and so long as the substantial or constitutional rights of persons charged are not infringed or violated, convictions cannot be reversed for mere irregularity."

We believe that it is a major responsibility of the proper administrative authorities to establish procedures for the guidance of officers which will make it possible for them to procure and bring into court evidence obtained in a manner which does not offend constitutional limitations.. The fact that evidence procured as the result of an illegal search may be admissible should not be used as justification for improper invasion of the privacy of a man's home.

Our most serious questions are whether the evidence was sufficient to establish that the city's exhibits constituted gambling devices as of June 15, 1946, and whether the evidence was sufficient to convict defendant of possession of gambling devices.

Ordinance No. 424 of the city of St. Paul, approved July 30, 1884, and amended by ordinance No. 1766, approved June 4, 1894, for the violation of which defendant was convicted, provides in part as follows:

"§ 385.  Faro and Gambling Devices Prohibited.

"No person within the City of St. Paul shall deal cards at the game called faro, pharo, or forty-eight (48), whether the same shall be dealt with fifty-two (52), or any other number of cards, and no

person shall keep, to be used in gaming, any gambling device whatever.

\*  \*  \*  \*  \*

"§ 387. Gambling Houses and Places Prohibited.

"No person shall keep any house or place for the purpose of gambling, nor shall any person suffer any gaming table, bank, or gambling device prohibited in this ordinance to be set up or used for the purpose of gaming in any house, building, steamboat, raft, keel, boat, or boom, lot, shop, yard, or garden to him belonging, or by him occupied, or of which he has the control."

A gambling device has been defined as anything which is used as a means for playing for money or other thing of value, so that the result depends more largely on chance than on skill. In re Lee Tong (D. C.) 18 F. 253. See, also, 18 Wd. & Phr. (Perm. ed.) p. 33. Gambling is defined as "a risking of money or other property between two or more persons on a contest of chance of any kind, where one must be the loser and the other the gainer." State v. Shaw, 39 Minn. 153, 156, 39 N. W. 305, 307. In that case it was held that "boards and lists" descriptive of horse races and the times and places of such races were not gambling devices, since the determination of the game of chance was not affected by their use. In State v. Grimes, 49 Minn. 443, 446, 52 N. W. 42, this court described a gambling device "as an invention or contrivance to determine the question as to who wins or who loses his money on a contest of chance." See, also, Zotalis v. Cannellos, 138 Minn. 179, 164 N. W. 807, L. R. A. 1918A, 1066; Foley v. Whelan, 219 Minn. 209, 17 N. W. (2d) 367.

The evidence which defendant claims was insufficient consists principally of three exhibits, referred to in the record as exhibits B, C, and D. Officer Failes identified exhibit B as "a dream book, lucky number book, with the name, 'Mrs. Stovall, 411 Rondo St., St. Paul, Minn.,' on it." Printed on the cover of the book is the following language: "NEW KEY TO FIND YOUR OWN NUMBERS BASED ON SYSTEMS OF THE ANCIENTS. AUNT SALLY'S POLICY PLAYERS DREAM

BOOK. STUDY OF HARMONY IN NUMBERS." Exhibit C is identified by the officer as a book that "is used to list the numbers." It is quite an ordinary-looking, oblong, red-covered notebook similar to ones sometimes used in a business way for keeping memorandums, notations, etc. It contains a series of red and green numbers in column form on each side of the page. There are occasional written entries in the book between the columns of numbers, as, for example, on one page "Stovall Start," and on another page "Stovall Close." There are also a few other names referred to in the same manner. The last page of the book that we can identify seems to show a date about February 16, 1945. Exhibit D was identified by the officer as "tissue paper. * * * we found this in the desk drawer with the other two exhibits * * *. Contains a series of numbers, dates, and they are carbon copies." This exhibit consists of several carbon copies on light tissue paper, on which are written a series of miscellaneous numbers which apparently correspond in some manner to the numbers referred to in exhibits B and C.

It is possible to infer that the exhibits were used in connection with an operation whereby someone solicited or received applications for numbers from persons who paid a consideration for the chance of winning a prize. It is also conceivable that the devices were but relics of past operations and that at the time of the arrest they were useless as aids in gambling activities. It is quite evident, however, especially with reference to exhibit B, that the paraphernalia was or could be used in connection with playing policy, a form of lottery or gambling. There was testimony on the part of the officers that the articles found in defendant's home were used or could be used in writing policy and were therefore gambling devices. The trial court, after hearing all the testimony and observing the exhibits, concluded that they were gambling devices within the meaning of the ordinance, and this court will not overrule that conclusion.

While none of the officer witnesses qualified themselves as experts on the subject, we believe that from the testimony a sufficient knowledge of the paraphernalia was demonstrated by some of the officers to give credence to their testimony as to the nature of the exhibits.

We believe, however, that it would have been better practice, in attempting to identify some of the so-called gambling equipment or devices, if expert witnesses had been used to furnish a particular or special knowledge of the articles involved.

We cannot agree, however, that the evidence was sufficient to prove that defendant "wrongfully, unlawfully, and wilfully" had in his possession the gambling devices referred to herein, as alleged in the complaint. It is true that the exhibits were found in a desk drawer in his home, but the record is not convincing that the paraphernalia was in the possession of defendant at the time of his arrest or at any time immediately prior thereto. On the contrary, if we are to be guided by the name as shown on exhibit B, the so-called dream book was the property of Mrs. Stovall, 411 Rondo avenue, St. Paul, Minnesota, as her name is written on the detachable covering of the dream book. There is nothing that we can find in exhibit C disclosing that defendant was the owner, except the fact that at different entries the words "Stovall Start" and "Stovall Close" are written. When defendant was "brought to headquarters" on June 15, officer Joseph Schmitz reminded him about a trip he made to defendant's home on March 1 on a complaint received at that time about policy writing. According to Schmitz, "he [defendant] told me that he remembered that." Schmitz claimed that he had warned defendant on March 1 to refrain from writing policy. Defendant steadfastly denied any knowledge of the game. He said that he had lived at 411 Rondo avenue about nine years, that he was buying his home on a contract, and that he had been employed for about 20 years off and on in the street department of the city of St. Paul. He said that he did not know anything about policy, that he did not know that exhibit B, the dream book, was in the house, and denied that it ever belonged to him. He said that he never saw exhibit C before the officer took it out of the drawer, that he never used it, and that he had nothing to do with the slips of paper referred to as exhibit D. He made no attempt to stop the officer in the search and said that he did not know how the exhibits came to be in the desk in the dining room, "unless my boy brought them there when he came

from the army." He said that he did not know whether his wife or boy put them there. In response to a question as to whether his wife was ever arrested for policy writing, he said, "A long time ago they had her down here for something like that," and he thought she was fined. He denied that he had anything to do with that affair and denied any knowledge that the paraphernalia was in his home. Officer Schmitz further said that he asked defendant "how come he had this stuff in their possession if they weren't doing policy writing. He told me he didn't know they were there." The officer, however, said that he asked him what they were and that defendant said it was "stuff used for policy writing," but denied that he had anything to do with it. Defendant also testified that he had no school education, that he could write his name, "but if I write anything else, I got to copy." While exhibit D is the only one showing writing or figures, an examination of it would indicate that the writing was done by one having more writing skill than would be indicated by the testimony of defendant.

We conclude that the city did not prove by a fair preponderance of the evidence that on June 15, 1946, defendant wrongfully, unlawfully, and wilfully had in his possession at 411 Rondo avenue the gambling devices referred to in the proceeding. While the record seems clear that the gambling devices were found in his home, we are not satisfied that they were in the possession of defendant, especially in view of the fact that Mrs. Stovall's name is clearly shown on exhibit B. For the reasons stated, we believe that the conviction cannot stand as against defendant.

In view of our holding with respect to the evidence, we do not think it necessary to rule on the adequacy of the complaint.

Reversed.