Ex parte OROZCO.

(District Court, W. D. Texas.. December 14, 1912.)

1. NEUTRALITY LAWS (§ 1*)—OFFENSES—AUTHORITY OF PRESIDENT—STATUTES.
  Pen. Code (Act March 4, 1909, c. 321, 35 Stat. 1090 [U. S. Comp. St.
  Supp. 1911, p. 1592]) § 14, relating to "offenses against neutrality," pro-
  vides that the President or such other person as he shall have em-
  powered for the purpose may employ the land and naval forces to take
  possession of and detain vessels, etc., and to prevent the carrying on of
  any military expedition or enterprise from the territory or jurisdiction
  of the United States against the territory or dominion of any foreign
  prince or state, or any colony, district, or people with whom the United
  States is at peace, does not empower the President, in time of peace, to
  use the military power to arrest without a warrant and imprison without
  trial a person merely suspected of being within the United States for the
  purpose of organizing a military expedition in aid of a revolution in his
  own country with which the United States is at peace.

  [Ed. Note.—For other cases, see Neutrality Laws, Cent. Dig. §§ 1, 2;
  Dec. Dig. § 1.*]

2. NEUTRALITY LAWS (§ 1*)—ARREST OF ALIENS—CONSTITUTIONAL PROVISIONS.
  Since the fifth amendment of the federal Constitution guaranteeing
  to an individual immunity against being deprived of his liberty without
  due process of law, and the fourth amendment, declaring that warrants
  shall not be issued except on probable cause supported by oath or af-
  firmation, and the sixth amendment, guaranteeing to accused a speedy
  and public trial by a jury of the district where the crime was commit-
  ted, are applicable to aliens sojourning in the United States, as well as
  to citizens, the President in time of peace has no right to use the mili-
  tary forces for the arrest of an alien temporarily residing in the United
  States and to imprison him indefinitely without trial while the officers
  of the government are endeavoring to secure evidence against the alien
  for violating the neutrality laws existing between the United States
  and the country of which the alien is a citizen, in which a revolution is
  in progress with which the alien has been identified.

  [Ed. Note.—For other cases, see Neutrality Laws, Cent. Dig. §§ 1, 2;
  Dec. Dig. § 1.*]

3. HABEAS CORPUS (§ 29*)—SCOPE OF WRIT—ARREST BY EXECUTIVE ORDER.
  Where relator, a Mexican alien, identified with a revolution in that
  country, came into the United States, and while there was illegally ar-
  rested by order of the President, and held by the military authorities
  without trial while effort was being made to show that he was in the
  United States to violate the neutrality laws, the order directing his ar-
  rest was void, and he was entitled to discharge on habeas corpus.

  [Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 24; Dec.
  Dig. § 29.*]

Petition for writ of habeas corpus, on relation of Pascual Orozco,
Sr., to secure his release from custody of the military authorities of
the United States pending investigation to determine whether he could
be held for violation of the neutrality laws between the United States
and Mexico. Writ granted, and relator discharged on entering into a
recognizance in the sum of $2,500, with a surety for his appearance
to answer the judgment of the appellate court.

The relator, Pascual Orozco, Sr., has presented to the court a petition pray-
ing the issuance of a writ of habeas corpus, and his release from custody. He

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

is now confined at Ft. Sam Houston, San Antonio, Tex., and claims that he was arrested without warrant by the military authorities, and that his detention is unlawful. He alleges that he is guilty of no crime against the laws of the United States, and that he is charged with no offense, and that his arrest was but the exercise of arbitrary power by the military authorities. The relator bases the illegality of his restraint, employing the language of the petition, upon the following constitutional grounds: "Your applicant further avers that he is so unlawfully restrained in his liberty, contrary to the Constitution and laws of the United States, and particularly in contravention of article 3, § 1, of the Constitution of the United States, which provides: 'The judicial power of the United States shall be vested in one Supreme Court, and such inferior courts as the Congress may from time to time ordain and establish.' And of article 3, § 2, of the Constitution of the United States, which provides: 'The judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States and the treaties made, or which shall be made under their authority.' And of article 3, § 2 of the Constitution of the United States, which provides: 'The trial of all crimes, except in cases of impeachment, shall be by jury, and such trial shall be held in the state where the said crime shall have been committed, but when not committed within any state, the trial shall be at such place or places as the Congress may by law direct.' And article 4 of the amendments to the Constitution of the United States, which provides: 'The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.' And of article 5 of the amendments to the Constitution of the United States, which provides: 'No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of the law; nor shall private property be taken for public use without just compensation.' And of article 6 of the amendments to the Constitution of the United States, which provides: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense.' And of article 8 of the amendments to the Constitution of the United States, which provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' "

The writ duly issued, and in obedience to its command Col. Charles G. Treat, the commanding officer at Ft. Sam Houston, produced the relator, and submitted his return, which fully sets forth the reasons for his detention. From the return thus made it appears that the relator, Pascual Orozco, Sr., is a citizen of Mexico, and enjoys the rank of colonel in the army opposed to the administration of President Madero. He is the father of Gen. Orozco, and has been, with the son, engaged in the revolutionary movement now flagrant in the neighboring republic. For several months subsequent to January 31, 1912, relator was in command of the forces at Juarez, Mexico, a port of entry opposite El Paso, Tex. Upon the abandonment of Juarez, in the month of August following, he proceeded with his men to the village of Ojinaga, where, in September, a conflict occurred between the government and revolutionary forces, in which the former were successful. The relator made his escape, and crossed the Rio Grande to American territory, where he was arrested by United States troops, who were then patroling the river, and by them delivered to the civil authorities to answer an indictment which had been preferred against him in the federal court at El Paso, charging him and others with

a conspiracy, entered into on March 28, 1912, to export arms and ammunition to the Republic of Mexico. Upon this charge he was duly tried, and on October 19th acquitted and ordered discharged. Subsequently, on November 10th, in pursuance of telegraphic orders issuing from the War Department by direction of the President, he was arrested in El Paso by the military authorities and by them detained in custody for a day or two, when he was removed to San Antonio, and on November 13th delivered to Col. Treat, who now holds him in custody, under instructions from the President.

It further appears that the military authorities have information that the relator intends to return to Mexico with the view of rejoining the revolutionary forces, and that it was his purpose and intention at the time of his arrest at El Paso to aid and assist in setting on foot, within the United States, a military expedition to be carried on against the republic of Mexico. While it is averred in the return of Col. Treat that the authorities have information of certain acts and conduct of the relator evidencing his intention to violate the neutrality laws, it is also alleged that they are "not informed of the commission of such overt acts as would probably at this time" warrant the filing of a complaint and the issuance of a warrant of arrest against him. The respondent further advises the court that the authorities are engaged in obtaining evidence touching the illegal acts of the relator, and he indulges the belief that sufficient evidence will soon be obtained to justify the filing of a criminal complaint against him by the civil authorities. The averments of the return are somewhat vague as to the time when the relator will be delivered to the civil authorities, but it may be inferred that it is the intention of the respondent and of his superior officers to surrender him when sufficient evidence of his guilt has been procured to authorize his prosecution. In this connection the respondent denies that the relator is held upon a charge of violating the military laws of the United States, or that he is held for trial by court-martial. Finally, it is insisted by the respondent that the relator should be remanded to the custody of the military authorities "to await further orders."

Touching the power of the President to cause the arrest and detention of the relator, the return of the respondent employs the following language: "The respondent is commanding officer of the United States Army, United States of America, at Ft. Sam Houston, in Bexar county, Tex., and there holds interned and in detention the person of one Pascual Orozco, Sr., in accordance with and pursuant to orders from the War Department, and instructions of the Secretary of War of the United States of America, directing such detention of said Pascual Orozco, Sr., with the approval and at the direction of the President of the United States of America, Commander in Chief of the Army by virtue of the power vested in the President of the said United States, and Secretary of War, so empowered by the President of the said United States for such purpose, by section 14 of the Criminal Code of the said United States (being same as section 5287 of the Revised Statutes of the United States), to employ the army for the purpose of preventing the carrying on of any military expedition or enterprise from the territory or jurisdiction of the said United States of America against the territory or dominion of any foreign prince or state, or of any colony, district or people with whom the United States are at peace, or the violation of any of the neutrality laws of the said United States." Section 14 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1090 [U. S. Comp. Supp. 1911, p. 1592]), provides: "The District Courts shall take cognizance of all complaints, by whomsoever instituted in cases of captures made within the waters of the United States, or within a marine league of the coasts or shores thereof. In every case in which a vessel is fitted out and armed, or attempted to be fitted out and armed, or in which the force of any vessel of war, cruiser, or other armed vessel is increased or augmented, or in which any military expedition or enterprise is begun or set on foot, contrary to the provisions and prohibitions of this chapter; and in every case of the capture of a vessel within the jurisdiction or protection of the United States as before defined; and in every case in which any process issuing out of any court of the United States is disobeyed or resisted by any persons having the custody of any vessel of war, cruiser or other armed vessel of any foreign prince, or state, or of any colony, district or people, or of

any subjects or citizens of any foreign prince or state, or of any colony, district or people, it shall be lawful for the President or such other person as he shall have empowered for that purpose, to employ such part of the land or naval forces of the United States, or of the militia thereof, for the purpose of taking possession of and detaining any such vessel with her prizes, if any, in order to enforce the execution of the prohibitions and penalties of this chapter, and the restoring of such prizes in the cases in which restoration shall be adjudged; and also for the purpose of preventing the carrying on of any such expedition or enterprise from the territory of the United States against the territory or dominion of any foreign prince or state, or of any colony, district or people with whom the United States are at peace." To the return of Col. Treat the relator interposed a demurrer, the grounds of which are founded upon the constitutional provisions hereinbefore set forth.

The cause is therefore submitted to the court upon demurrer to the facts averred in the return, the truth of which the demurrer admits.

Goldstein & Miller, of El Paso, Tex., for relator.

Charles A. Boynton, U. S. Atty., of Waco, Tex., and Charles C. Cresson, Asst. U. S. Atty., of San Antonio, Tex., for the United States.

MAXEY, District Judge (after stating the facts as above). While the duty has devolved upon the writer during a long period of judicial service to decide many grave and important questions, he has not been called upon to determine one of more delicacy than that now submitted for consideration. Broadly speaking, the question involves, on the one hand, personal liberty; on the other the power of the President, in the exercise of his constitutional functions, to restrict that liberty. To the solution of the problem thus presented the court has given anxious thought; and, to enable it to reach a satisfactory conclusion, all available sources of information have been consulted.

To somewhat abbreviate the discussion, it may be noted in limine that the military laws are not here involved, since the relator is not engaged in either the military or naval service of the United States. Nor is it pertinent to inquire into the powers of the chief executive during the reign of martial law—that species of law denominated by jurists of distinction as "not law, in any proper sense, but merely the will of the military commander, to be exercised by him only on his responsibility to his government or superior officer." Martial law prevails when war is flagrant, and the civil courts are powerless to exercise their accustomed jurisdiction. Such conditions do not now exist. Our country is at peace with all nations, and there is nothing to disturb the civil courts in the orderly discharge of their appropriate duties. And "where peace prevails," said the Chief Justice in Ex parte Milligan, "the laws of peace must prevail." 4 Wall. 140, 18 L. Ed. 281. Where, then, do we find the law which authorized the President to arrest the relator without warrant, in violation of the fourth amendment of the Constitution, and to deprive him of his liberty without due process of law in contravention of the fifth?

[1] It is said by the respondent that this power of summary arrest and detention is derived from the provisions of section 14 of the Penal Code. This section, forming part of the chapter on the subject of "offenses against neutrality," so far as it affects the present inquiry, makes it lawful for the "President or such other person as he

shall have empowered for that purpose, to employ the land and naval forces" for two purposes, to wit: (1) For the purpose of taking possession of and detaining vessels, etc.; and (2) for the purpose of preventing the carrying on of any military expedition or enterprise from the territory or jurisdiction of the United States against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States are at peace. In analyzing the section, it will be observed that in reference to vessels express power is conferred to seize and detain; but no power is conferred, in terms, authorizing the arrest and imprisonment of persons. The President may employ the army in preventing the carrying on of a military expedition from our own territory against the Republic of Mexico, and his discretion in calling out the military forces for that purpose is not subject to the review and control of the courts. And it may be further said, in the language of the Supreme Court, that:

"Whenever a statute gives a discretionary power to any person to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the only and exclusive judge of the existence of such facts." Martin v. Mott, 12 Wheat. 31, 32, 6 L. Ed. 537; Luther v. Borden, 7 How. 45, 12 L. Ed. 581.

This principle is especially true when applied to the acts of the chief magistrate of the nation, and, when he "exercises an authority confided to him by law, the presumption is that it is exercised in pursuance of law." These principles are freely conceded. But in using the army to prevent the carrying on of a military expedition against Mexico may he go further, and arrest, without warrant and imprison without the benefit of a trial, persons who are suspected of organizing such expeditions? It is manifest that no such extraordinary authority is expressly conferred by the statute; and in Gelston v. Hoyt, 3 Wheat. 332, 4 L. Ed. 381, a case involving the powers of the President, it was said by Mr. Justice Story that:

"It is certainly against the general theory of our institutions to create great discretionary powers by implication."

Do the facts of the present case justify it? At the time of his arrest the relator was sojourning in the city of El Paso. He had been recently acquitted by a jury on the charge of conspiring to export arms to Mexico in violation of the resolution of the Congress and the proclamation of the President. It was a time of peace. The courts were open, and there were a United States commissioner and deputies of the marshal to issue warrants and serve process. There was absolutely no obstruction to the administration of justice by the civil courts, and there was in El Paso no hostile force threatening to invade Mexico to overthrow the existing government. Why, then, cause his arrest by the military authorities, and transport him 600 miles to San Antonio to be held in custody at Ft. Sam Houston?

It is not pretended that for any act committed the relator is amenable to trial by court-martial. But it is insisted by counsel for the respondent that the President has lawful authority, not only to invoke

the aid of the army to prevent the carrying on of a military expedition against Mexico, but also to arrest and detain any persons engaged in the illegal movement. In this connection the views of Attorney General Harmon may be read with profit. In a communication addressed by him to the Secretary of State, he wrote as follows:

"It is certain, however, that the executive has no right to interfere with or control the action of the judiciary in proceedings against persons charged with being concerned in hostile expeditions against friendly nations. The President may employ the military and naval forces to disperse or prevent the departure from our territory of any such expedition, or of any men, arms, or munitions which are manifestly parts thereof; and, being a co-ordinate authority, he would not be precluded from so doing in a proper case by the action of the judiciary. But it is plain that such means are practicable only when there is open defiance of the authority of the government by an organized body of men. Occasions may be imagined when the summary process of martial law might perhaps be resorted to against the persons composing such a body. But in all such cases as those which have come to the notice of the government these conditions do not exist, and the judicial authority is the only one which can be properly or efficiently invoked. See Mr. Bayard to the Spanish minister. 3 Whart. Dig. Int. Law, p. 625. Our government possesses all the attributes of sovereignty with respect to the present subject, and has for their exercise the appropriate agencies which are recognized among civilized nations; but our Constitution forbids the arbitrary exercise of power when the liberty or property of individual citizens is involved. It cannot, therefore, resort to some measures which are still possible in some countries." 21 Op. Attys. Gen. 273.

That the President has lawful power to employ the army in dispersing or preventing the departure from our territory of a military expedition against Mexico is clear beyond controversy. In the execution of that high duty soldiers employed might encounter forcible resistance. They would in such contingency obviously have the right to use sufficient force to overcome that resistance. In order to disperse or prevent the departure of the expedition, it might, and probably would, become necessary to effect the capture of the persons therein engaged. Thus far the army would be acting within the scope of its lawful powers. But even in the case supposed it is thought that it would become the plain duty of the captors to deliver the persons arrested within a reasonable time—that is, at the earliest convenient opportunity—to the civil authorities, to be dealt with according to the law of the land. Such was the course pursued by the military authorities in reference to the first arrest of the relator after his escape to American territory, following the Ojinaga encounter in September. And having been delivered to the marshal, as the executive officer of the court, he was, in due season, accorded a fair and impartial trial, in obedience to constitutional requirements and according to the forms of law. But his subsequent arrest and imprisonment at El Paso on November 10th, without warrant and merely upon an order directed by the President, stands upon a different footing. The conditions then existing repelled the thought that the intervention of the military was necessary to the administration of justice. The civil courts, with their equipment, were competent to deal with all disturbers of the peace and with all persons offending against the neutrality or other statutes. The military authorities were not there en-

gaged in dispersing or expelling from our territory an armed force, constituting a hostile military expedition, since no such force existed in El Paso. Whence then comes the power for the interference of the military authorities? We have seen that it is not expressly conferred by section 14 of the Penal Code, and it would be contrary to the general theory of our institutions, repeating the language of Mr. Justice Story, to create such discretionary powers by implication.

[2] The power to arrest without warrant and to deprive the individual of his liberty without due process of law has no existence in this country. It has not been committed to any official, however high his station, nor to any department of the government, either executive, legislative, or judicial. Every department must act in obedience to the mandates of the Constitution. No one of them may usurp powers forbidden by that instrument, and none of them may perform acts in violation of its commands. When, therefore, an individual is arrested without warrant, in disregard of the fourth amendment, and imprisoned without due process of law, in violation of the fifth, the arrest and imprisonment are unlawful, and cannot be sustained in a court of justice. The treatment of the relator is embraced within this category. His arrest upon the mere order of the President was in contravention of the fourth amendment of the Constitution, and his continued detention is repugnant not only to the fifth amendment, but also to the sixth, which guarantees to the accused the right to a speedy and public trial by a jury of the district where the crime shall have been committed.

The views expressed by the court are supported by high authority. In a communication addressed by Attorney General Black to the President on the subject of the "Power of the President in executing the Laws," among other things it was said:

"To the chief executive magistrate of the Union is confided the solemn duty of seeing the laws faithfully executed. That he may be able to meet this duty with a power equal to its performance, he nominates his own subordinates, and removes them at his pleasure. For the same reason, the land and naval forces are under his orders as their commander in chief. But his power is to be used only in the manner prescribed by the legislative department. He cannot accomplish a legal purpose by illegal means, or break the laws himself to prevent them from being violated by others." 9 Op. Attys. General, 518, 519.

Mr. Wirt as Attorney General in the year 1818 addressed the President as follows:

"Sir: Mr. Calhoun has called on me at the desire of the Secretary of State (now absent), for the purpose of inquiring whether I would advise a proclamation against Obed Wright, of Georgia, or private instructions to the marshals of the several districts and territories, for the apprehension of the fugitive. On inquiry at the department of state, no precedent is to be found for either course, as you will find from Mr. Brent's answer to some questions put by me, which I inclose. The case to which he alludes by memory is that, he says, of Bradford, who was implicated in the Pennsylvania insurrection. But we know not what degree of evidence General Washington might have had against Bradford to warrant his proclamation, or whether he relied upon the openness and notoriety of the fact of the insurrection, which was very little, if anything, short of bellum flagrans. The result of the inquiry is that there is no certain precedent to guide us as to either course, and I have very strong doubts (in which Mr. Calhoun concurs) whether either of the courses proposed

is warranted by the Constitution. Arrest for trial is a proceeding which belongs to the judicial, not to the executive, branch of the government, and the warrant of arrest is always preceded by evidence—ex parte to be sure, but still evidence—to wit, information on oath. Can the President of the United States order an arrest either by proclamation or by instructions to marshals? Would not such proclamation or instructions be, in effect, a warrant to arrest? It is very clear to me that they would; and that either of them would be a violation of the sixth (fourth) article of the amendments of the Constitution of the United States, which provides that 'the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.' It was one of the strong grounds of objection to the celebrated alien law that it gave the President power to arrest, 'a power,' says Judge Tucker, 'which it was presumed did not exist either in the executive of the state or of the federal government.' 4 Tucker's Black. 290. Would not a better course be to have an indictment submitted to the next grand jury for the circuit court of Georgia; and, if found by them to cause authenticated copies of it to be furnished to the several marshals and collectors of the United States, with instructions, if Wright should make his appearance anywhere within the United States, to cause him to be arrested according to law, with special reference, if necessary, to the sixth amendment to the Constitution of the United States and the thirty-third section of the judiciary act, which points out the mode of arrest? There is nothing in this suggestion which denies to the President the power of issuing his proclamation against an offender who has once been regularly arrested and has made his escape; for the regularity of the arrest implies that the probable cause has been furnished on oath or affirmation according to the amendment of the Constitution, and that the warrant of arrest has been duly issued, and has had its effect."

But we are not confined to the opinions of cabinet officers. In 1861 Mr. Chief Justice Taney had under consideration the case of Ex parte Merryman. The case may be readily understood from a partial statement as made by the Chief Justice, as follows:

"A copy of the warrant or order under which the prisoner was arrested was demanded by his counsel and refused; and it is not alleged in the return that any specific act, constituting any offense against the laws of the United States, has been charged against him upon oath, but he appears to have been arrested upon general charges of treason and rebellion without proof, and without giving the names of the witnesses, or specifying the acts which, in the judgment of the military officer, constituted these crimes. Having the prisoner thus in custody upon these vague and unsupported accusations, he refuses to obey the writ of habeas corpus, upon the ground that he is duly authorized by the President to suspend it. The case, then, is simply this: A military officer, residing in Pennsylvania, issues an order to arrest a citizen of Maryland upon vague and indefinite charges without any proof, so far as appears. Under this order, his house is entered in the night, he is seized, as a prisoner, and conveyed to Ft. McHenry, and there kept in close confinement; and when a habeas corpus is served on the commanding officer, requiring him to produce the prisoner before a justice of the Supreme Court, in order that he may examine into the legality of the imprisonment, the answer of the officer is that he is authorized by the President to suspend the writ of habeas corpus at his discretion, and, in the exercise of that discretion, suspends it in this case, and on that ground refuses obedience to the writ." 17 Fed. Cas. 147, 148.

In the opinion, discussing the powers of the President at page 149 of 17 Fed. Cas., the Chief Justice said:

"So, too, his powers in relation to the civil duties and authority necessarily conferred on him are carefully restricted, as well as those belonging to his

201 F.—8

military character. He cannot appoint the ordinary officers of government, nor make a treaty with a foreign nation or Indian tribe, without the advice and consent of the Senate, and cannot appoint even inferior officers, unless he is authorized by an act of Congress to do so. He is not empowered to arrest any one charged with an offense against the United States, and whom he may, from the evidence before him believe to be guilty; nor can be authorize any officer, civil or military, to exercise this power, for the fifth article of the amendments to the Constitution expressly provides that no person 'shall be deprived of his life, liberty or property without due process of law'—that is, judicial process. Even if the privilege of the writ of habeas corpus were suspended by act of Congress, and a party not subject to the rules and articles of war were afterwards arrested and imprisoned by regular judicial process, he could not be detained in prison, or brought to trial before a military tribunal, for the article in the amendments to the Constitution immediately following the one above referred to (that is, the sixth article) provides that, 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law; and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense.' The only power, therefore, which the President possesses, where the 'life, liberty or property' of a private citizen is concerned, is the power and duty prescribed in the third section of the second article, which requires 'that he shall take care that the laws shall be faithfully executed.' He is not authorized to execute them himself, or through agents or officers, civil or military, appointed by himself, but he is to take care that they be faithfully carried into execution, as they are expounded and adjudged by the co-ordinate branch of the government to which that duty is assigned by the Constitution. It is thus made his duty to come in aid of the judicial authority, if it shall be resisted by a force too strong to be overcome without the assistance of the executive arm; but in exercising this power he acts in subordination to judicial authority, assisting it to execute its process and enforce its judgments."

### At page 150 of 17 Fed. Cas. he continued:

"Indeed, the security against imprisonment by executive authority, provided for in the fifth article of the amendments to the Constitution which I have before quoted, is nothing more than a copy of a like provision in the English Constitution, which had been firmly established before the declaration of independence. Blackstone states it in the following words: 'To make imprisonment lawful, it must be either by process of law from the courts of judicature, or by warrant from some legal officer having authority to commit to prison.' 1 Bl. Comm. 137. The people of the United Colonies, who had themselves lived under its protection, while they were British subjects, were well aware of the necessity of this safeguard for their personal liberty. And no one can believe that in framing a government intended to guard still more efficiently the rights and liberties of the citizen against executive encroachment and oppression they would have conferred on the President a power which the history of England had proved to be dangerous and oppressive in the hands of the crown, and which the people of England had compelled it to surrender, after a long and obstinate struggle on the part of the English executive to usurp and retain it."

### And at page 152 of 17 Fed. Cas. he indicated the course which should have been pursued by the military, upon the arrest of Merryman, in the following language:

"For, at the time these proceedings were had against John Merryman, the district judge of Maryland, the commissioner appointed under the act of Congress, the district attorney, and the marshal all resided in the city of Baltimore, a few miles only from the home of the prisoner. Up to that time there had never been the slightest resistance or obstruction to the process of any

court or judicial officer of the United States in Maryland, except by the military authority. And if a military officer, or any other person, had reason to believe that the prisoner had committed any offense against the laws of the United States, it was his duty to give information of the fact and the evidence to support it to the district attorney. It would then have become the duty of that officer to bring the matter before the district judge or commissioner, and, if there was sufficient legal evidence to justify his arrest, the judge or commissioner would have issued his warrant to the marshal to arrest him; and upon the hearing of the case would have held him to bail, or committed him for trial, according to the character of the offense, as it appeared in the testimony, or would have discharged him immediately, if there was not sufficient evidence to support the accusation. There was no danger of any obstruction or resistance to the action of the civil authorities, and therefore no reason whatever for the interposition of the military."

Such were the principles enunciated by the Chief Justice in favor of liberty at a time when the clash of arms resounded throughout the land and the fate of the republic was thought to hang in the balance. In an exigency so pressing the venerable jurist would doubtless have been inclined to go to the very verge of his authority in the effort to strengthen the hands of the President, and enlarge his administrative powers. But personal liberty, intrenched in and effectively protected by the safeguards of the Constitution, was a thing too sacred to be disregarded, notwithstanding the peril to the national life.

Thus reasoned also Mr. Justice Lawrence, as the organ of the Supreme Court of Illinois, in the case of Johnson v. Jones, 44 Ill. 142, 92 Am. Dec. 159–178. This case originated in 1862. It was an action of trespass brought by Johnson to recover damages for an unlawful arrest. It was averred in the pleas of certain of the defendants that Johnson was a member of a disloyal secret society, known as the Knights of the Golden Circle, that he was deeply engaged in aiding the society in their treasonable purposes, and was in fact levying war against the United States. The pleas mentioned contained the following additional averments:

"The defendant Jones was at that time United States marshal for the Northern District of Illinois, and that said defendants Hawkins and Hopkins were his deputies; that as such marshal he was ordered by the President of the United States to arrest said plaintiff, as a measure proper for the suppression of the rebellion, and convey him to Ft. Lafayette; and that he did so arrest him, and convey him to said fort in a comfortable manner, and there delivered him to the custody of the officer in command of said fort, after which time the plaintiff was not in the custody of the defendant."

It will be observed that at the time of Johnson's arrest war was flagrant as it was when Merryman was taken into custody. He was arrested by the United States marshal, upon the order of the President, for treasonable designs against the government, and imprisoned in Ft. Lafayette. If the President was without power to issue an order of arrest at such a time and under such circumstances, let it be asked, Whence comes the power in a season of profound peace? In an opinion which reflects luster upon the author the power was denied the President in Johnson's Case, and it was decided that he had a good cause of action. In discussing the question it was said by the

learned justice at pages 147, 148, of 44 Ill., at pages 163, 164, of 92 Am. Dec.:

"That the President of the United States has the rightful power in time of peace to cause a marshal to arrest a citizen of Illinois without process and without any charge of crime legally preferred, and convey him to a distant state, and there imprison him without judicial writ or warrant in a military fortress, is a proposition which no one would have the hardihood to assert. That such power in a season of peace cannot be safely intrusted to any government by a people claiming to be free is a political truism lying beyond the domain of argument. The right of the citizen to his personal liberty, except when restrained of it upon a charge of crime and for the purpose of judicial investigation, or under the command of the law pronounced through a judicial tribunal, is one of those elementary facts which lie at the foundation of our political structure. The cardinal object of our Constitution, as it is the end of all good government, is to secure the people in their right to life, liberty, and property. The more certainly to attain this end, the framers of our Constitution, not only proclaimed certain great principles in the Bill of Rights, but they distributed governmental powers into three distinct departments, each of which, while acting in its proper sphere, was designed to be independent of the others. To the legislative department it belongs to declare the causes for which the liberty of a citizen may be taken from him; to the judicial department to determine the existence of such causes in any given case; and to the executive to enforce the sentence of the court. If a citizen can be arrested, except upon a charge of violated law, and for the purpose of taking him before some judicial tribunal for investigation, then it is plain that the executive department has usurped the functions of the other two, and the whole theory of our government, so far as it related to the protection of private rights, is overthrown. But on this question we are not left merely to arguments drawn from the general spirit and object of our Constitution. Our forefathers had fresh in their memory the struggles which it had cost in England to secure those two great charters of freedom, the Magna Charta of King John's time, and the Bill of Rights of 1688, and they incorporated into our fundamental law whatever was most valuable in those instruments for the security of life, liberty, and property. They provided in article 4 of the amendments that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.' They further provided, in article 5, that 'no person shall be deprived of life, liberty, or property without due process of law'; and, in article 6, that 'in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law; and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense.' "

At pages 160, 161, of 44 Ill., at pages 174, 175, of 92 Am. Dec., it was further said:

"It is a fearful power that is claimed for the government by the counsel for the appellee, and one which no free government ought to possess. Even in England, in the latter part of the last century, when secret political societies were formed hostile to the government and in league with the French revolutionists, or supposed to be so, although the country was at war with France, yet, while the high Tory administration of Mr. Pitt arrested, prosecuted, and punished with a pitiless vigor, it acted only through the ordinary agencies of the civil courts, and made no use of the military arm under the pretense that the offending persons were belligerents or public enemies. If this plaintiff, was guilty of the charges made in the plea, he merited arrest and a severe punishment, but he should have been punished in conformity to law. It is to

be remembered that the question before us is one of power simply on the part of the executive, and not of deserving on the part of the plaintiff. If the President could rightfully arrest him by military force, and consign him without process or trial to a fortress in the harbor of New York, he could do the same thing to any other person in the State of Illinois, however innocent of crime. This plaintiff may have been disloyal, and seeking to aid the rebels, but the most loyal citizen might have been arrested and sent away in the same summary manner. As no charge is made, no judicial investigation had, it is left entirely to the caprice of the government to determine what persons shall be seized. The power to thus arrest being once conceded, every man in the state, from the Governor down to the humblest citizen, would hold his liberty at the mercy of the military officer in command."

Apply the closing language of the excerpt to the case at bar, concede the principle contended for by the respondent, and every man in the country would hold his liberty at the mercy of the President, and the military would then become independent of and superior to the civil power. In the famous case of Ex parte Milligan, 4 Wall. at pages 128, 129, 18 L. Ed. 281, it was said by Mr. Justice Davis, speaking for the court, that:

"In some parts of the country, during the War of 1812, our officers made arbitrary arrests, and, by military tribunals, tried citizens who were not in the military service. These arrests and trials, when brought to the notice of the courts, were uniformly condemned as illegal."

But it may be objected that the provisions of the Constitution, to which reference has been made, afford no protection to foreigners, and that they apply solely to our own citizens. To this objection the courts have responded in the negative. In Ex parte Milligan it was said that:

"The Constitution of the United States is a law for rulers and people, equally in war and peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances." 4 Wall. 120, 121, 18 L. Ed. 281.

The language of the court in Wong Wing v. United States, 163 U. S., at page 238, 16 Sup. Ct., at page 981, 41 L. Ed. 140, is equally emphatic:

"And in the case of Yick Wo v. Hopkins, 118 U. S. 356, 369 [6 Sup. Ct. 1064, 1070 (30 L. Ed. 220)], it was said: 'The fourteenth amendment to the Constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." These provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or nationality; and the equal protecton of the laws is a pledge of the protection of equal laws.' Applying this reasoning to the fifth and sixth amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty or property without due process of law."

In this connection the apt and forceful words of Mr. Justice Field deserve repetition:

"The term 'person,' used in the fifth amendment, is broad enough to include any and every human being within the jurisdiction of the republic. A resident

alien born is entitled to the same protection under the laws that a citizen is entitled to. He owes obedience to the laws of the country in which he is domiciled, and, as a consequence, he is entitled to the equal protection of those laws. This has been decided so often that the point does not require argument. Yick Wo v. Hopkins, 118 U. S. 356, 369 [6 Sup. Ct. 1064, 30 L. Ed. 220]; Ho Ah Kow v. Nunan, 5 Sawy. 552 [Fed. Cas. No. 6,546]; Carlisle v. United States, 16 Wall, 147 [21 L. Ed. 426]; In re Lee Tong [D. C.] 18 Fed. 253; In re Wong Yung Quy, 6 Sawy. 237 [47 Fed. 717]; In re Chow Goo Pooi [C. C.] 25 Fed. 77. The contention that persons within the territorial jurisdiction of this republic might be beyond the protection of the law was heard with pain on the argument at the bar—in face of the great constitutional amendment which declares that no state shall deny to any person within its jurisdiction the equal protection of the laws. Far nobler was the boast of the great French Cardinal who exercised power in the public affairs of France for years that never in all his time did he deny justice to any one, 'For fifteen years,' such were his words, 'while in these hands dwelt empire, the humblest craftsman, the obscurest vassal, the very leper shrinking from the sun, though loathed by charity, might ask for justice.'" 163 U. S. 242, 243, 16 Sup. Ct. 983, 41 L. Ed. 140.

It is thus seen that the safeguards of the fourth, fifth, and sixth amendments of the Constitution protect citizens and aliens alike; and hence the foreigner, equally with the native born, may invoke their aid to guard against the assaults of arbitrary power.

[3] Without further discussion of the interesting question involved in the controversy, the court contents itself with the statement of the following conclusions: (1) The President was without lawful power to order the arrest and imprisonment of the relator; (2) the order issued by his direction for such arrest was inoperative and void; and (3) the relator, being illegally restrained of his liberty by the military authorities, is entitled to be enlarged.

It is therefore the order of the court that he be discharged from custody upon entering into recognizance in the sum of $2,500, with surety, as prescribed by rule 34 of the Supreme Court, for appearance to answer the judgment of the appellate court.

The court is mindful of the fact that the decision of this case attributes to the President the unlawful exercise of power. But in view of his eminence as a jurist and his well-known devotion to the laws of the country, and to the principles of constitutional liberty, the writer takes pleasure in disclaiming any intention of imputing to that distinguished official the purpose, or desire, to usurp powers not lawfully confided to the chief magistrate of the Union. That he has earnestly and persistently endeavored to enforce the neutrality statutes and thus to preserve amicable relations with our sister republic is known to all men, and that in ordering the arrest and imprisonment of the relator he was actuated by the high motive to faithfully execute the laws, the writer readily admits. But these considerations should not affect the determination of legal questions. The relator has appealed to the court to set him free, and, if he be illegally restrained of his liberty, that appeal should not be in vain.