## Ex parte TOSCANO et al.

### (District Court, S. D. California, S. D.   November 5, 1913.)

### No. 659.

1. TREATIES (§§ 4, 12*) — VALIDITY — CONSTRUCTION AND OPERATION OF THE HAGUE TREATY—"INTERNMENT."

    The provision of chapter 2, art. 11, of The Hague Treaty of October 18, 1907, ratified by the United States and by Mexico November 27, 1909 (36 Stat. 2324), that "a neutral power which receives on its territory troops belonging to the belligerent armies shall intern them, as far as possible, at a distance from the theater of war," which act of internment consists in disarming such troops and keeping them in honorable confinement, does not violate any provision of the Constitution of the United States, nor require legislation to render it effective, and is therefore a part of the law of the land which the President has full power to execute.

    [Ed. Note.—For other cases, see Treaties, Cent. Dig. §§ 4, 12; Dec. Dig. §§ 4, 12.*]

2. TREATIES (§ 5*)—CONSTRUCTION AND OPERATION OF THE HAGUE TREATY.

    The two parties engaged in civil war in Mexico are belligerent parties according to the law of nations, and the fact that the United States has not accorded official recognition to either does not affect its right and duty to execute such treaty provision with respect to troops of either party who seek asylum in its territory.

    [Ed. Note.—For other cases, see Treaties, Cent. Dig. § 5; Dec. Dig. § 5.*]

3. CONSTITUTIONAL LAW (§ 251*)—"DUE PROCESS OF LAW"—MEANING.

    The words "due process of law" as used in Const. U. S. Amend. 5, were intended to convey the same meaning as the words "by the law of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

land," as found in the twenty-ninth chapter of the Magna Charta, and mean process due according to the law of the land.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 726, 727, 732; Dec. Dig. § 251.*

For other definitions, see Words and Phrases, vol. 3, pp. 2227–2256; vol. 8, p. 7644.]

Petition of Higinio Toscano and others for writ of habeas corpus. Writ denied.

H. R. Gamble, of El Paso, Tex., for petitioners.

Albert Schoonover, of San Diego, Cal., U. S. Atty., for the United States.

WELLBORN, District Judge. Petitioners, 208 in number, and the respondent have stipulated on this hearing the following facts:

"That since the early part of March, 1913, a state of civil war has existed in the republic of Mexico, and particularly in that part which is contiguous to the United States, and that one of the parties to this civil war is known as the Federalists, and the other party is known as the Constitutionalists, and that both the Federalists and the Constitutionalists have raised large numbers of troops, and armed and equipped them and formed them into a military organization, and that since March, 1913, a number of engagements and battles have taken place between the armed forces of the Federalists and the Constitutionalists.

"That the United States is not a party to said civil war, and is not allied with either the Federalists or the Constitutionalists, but at all times has and does now occupy the position known in international law as a neutral between the said contending parties.

"That on April 13, 1913, all the petitioners herein were officers or soldiers in the army of the Federalists, or were connected in some other capacity with said army, and were stationed on duty with said army at Naco in the state of Sonora, Mexico, and that none of said petitioners are citizens of the United States.

"That for several days prior to April 13, 1913, an armed force of the Constitutionalist army attacked the same town of Naco, and on April 13, 1913, the petitioners and other Federalist troops occupying the said town were defeated and driven out of said town of Naco, and were pursued by the victorious Constitutionalist troops, and to avoid surrendering to the Constitutionalist force, the Federalist troops fled with their arms across the boundary line between the United States and Mexico, and sought refuge and asylum from the pursuing enemy in the United States.

"That immediately upon crossing the said neutral boundary and reaching United States soil, the said petitioners and other Federalist troops belonging to said belligerent army voluntarily surrendered themselves to the armed forces of the United States, which said armed forces of the United States, acting under authority of the President of the United States, thereupon disarmed said belligerent troops and detained and interned them pending the removal of said belligerent troops to a point within the territory of the United States at a distance from the theater of said civil war.

"That thereafter, on or about April 25, 1913, said belligerent troops, including all of said petitioners, were removed by said armed forces of the United States, acting under the authority of the President of the United States, to Ft. Bliss, a military post of the United States near the city of El Paso, in the state of Texas, and on August 5, 1913, in pursuance of said authority, were removed to Ft. Rosecrans, Cal., a military post of the United States located at a distance from the theater of said civil war, and ever since such

removal have been and now are detained and interned in a camp set apart for such purpose.

"That said belligerent troops, including all of said petitioners, were so received on United States territory and disarmed, and have ever since been held in honorable detention and internment for the purpose of depriving them of the power to leave American soil to renew hostilities.

"That said detained and interned petitioners, ever since being so received on United States soil, have been and still are a part of the Federalist army of Mexico, and as such have, ever since their detention and internment, received from and been paid by said Federalist army pay and allowances as soldiers of said army according to their rank therein.

"So far as concerns the hearing on the application for writ of habeas corpus herein, it is agreed that none of the petitioners are charged with violation of any statute of the United States, and that no complaint or indictment has been made against the petitioners or any of them."

[1] The government bases its authority for detaining petitioners on chapter 2, art. 11, of the Convention at The Hague, October 18, 1907, ratified by the contracting powers, including the United States of America and Mexico, November 27, 1909, which provides that:

"A neutral power which receives on its territory troops belonging to the belligerent armies shall intern them, as far as possible, at a distance from the theater of war.

"It may keep them in camps and even confine them in fortresses or in places set apart for this purpose.

"It shall decide whether officers can be left at liberty on giving their parole not to leave the neutral territory without permission."

36 U. S. Stat. L. 2324.

The first contention of petitioners is that said treaty provisions are violative of the Constitution of the United States, or, more specifically, this contention is, quoting from their brief, as follows:

"It would seem clear, then, that these petitioners are being deprived of their liberty without due process of law in violation of the fifth amendment. And they are entitled to the protection of the fourth and sixth amendments as well as the fifth. They were arrested without warrant, in violation of the fourth, and have been detained more than four months without trial or hearing of any kind, in violation of the sixth."

Petitioners' references to the fourth and sixth amendments in no way strengthen their argument. If they are in custody by due process of law, their detention, of course, does not violate the fourth amendment, which is directed against "unreasonable" searches and seizures, nor has the sixth amendment, which simply requires certain procedure in criminal prosecutions, any application, because the case at bar in no way relates to a criminal prosecution.

Petitioners are not charged with any offense against either municipal or international law; indeed, The Hague Treaty impliedly allows, where humane considerations require, a neutral power to give refuge on its own territory to alien belligerents, exacting, however, as a matter of common justice, that the neutral power shall take suitable precautions to prevent the belligerents from leaving the neutral territory to renew hostilities.

The real issue between the parties may be accordingly stated thus: Are petitioners deprived of their liberty without due process of law, in violation of the fifth amendment?

Petitioners' assumption that said treaty provisions are criminal measures is at once the groundwork and chief infirmity of their argument. Internment is not a punishment for crime, but simply an appropriate means agreed upon for the temporary care of alien forces who seek asylum in neutral territory, and is defined as follows (underscoring mine):

"Modern practice, which ignores Bynkershoek's contention that flying troops may be followed into a neutral state, imposes upon such state the duty of receiving them under such conditions as will deprive them of the power to start again from its soil in order to renew hostilities. To secure that end, and at the same time to satisfy the claims of humanity, belligerent troops are disarmed as soon as they cross the neutral frontier, and detained in *honorable* confinement until the end of the war. While thus detained they are said to be interned—a condition which they must not resist, and the expense of which their government is in honor bound to bear." Taylor on International Public Law, p. 672.

Internment, in many respects, closely resembles the temporary confinement necessary to the exclusion or deportation of aliens, both being means respectively employed for the execution of laws—a treaty in the one case, and an act of Congress in the other.

The broad distinction between such temporary confinement and imprisonment as a punitive sanction is well illustrated in Wong Wing v. United States, 163 U. S. 228, 235, 16 Sup. Ct. 977, 980 (41 L. Ed. 140). There the court says:

"We think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid. Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation. Detention is a usual feature of every case of arrest on a criminal charge, even when an innocent person is wrongfully accused; but it is not imprisonment in a legal sense. * * *

"Thus, in the case of Fong Yue Ting v. United States, 149 U. S. 730 [13 Sup. Ct. 1028, 37 L. Ed. 905], Mr. Justice Gray used the following significant language: 'The proceeding before a United States judge, as provided for in section 6 of the act of 1892, is in no proper sense a trial and sentence for a crime or offense. It is simply the ascertainment, by appropriate and lawful means, of the fact whether the conditions exist upon which Congress has enacted that an alien of this class may remain within the country. The order of deportation is not a punishment for crime. It is not a "banishment," in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority and through the proper departments, has determined that his continuing to reside here shall depend. He has not therefore been deprived of life, liberty, or property without due process of law; and the provisions of the Constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures, and cruel and unusual punishments, have no application.' * * *

"No limits can be put by the courts upon the power of Congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land and unlawfully remain therein. But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the

sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial."

See, also, Turner v. Williams, 194 U. S. 279 [24 Sup. Ct. 719, 48 L. Ed. 979], wherein the court says:

· "Repeated decisions of this court have determined that Congress has the power to exclude aliens from the United States; to prescribe the terms and conditions on which they may come in; to establish regulations for sending out of the country such aliens as have entered in violation of law, and to commit the enforcement of such conditions and regulations to executive officers; that the deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law; and that the provisions of the Constitution securing the right of trial by jury have no application. * * * Detention or temporary confinement as part of the means necessary to give effect to the exclusion or expulsion was held valid, but so much of the act of 1892 as provided for imprisonment at hard labor without a judicial trial was held to be unconstitutional."

[3] The meaning of the phrase "due process of law" is succinctly given in petitioners' brief as follows:

"The principle, if not the language of the constitutional prohibition, is taken from Magna Charta, and it is well settled that the words 'due process of law' were intended to convey the same meaning as the words 'by the law of the land' found in the twenty-ninth chapter of that instrument. Lord Coke, in his commentary on those words, says they mean due process of law. The requirement of due process of law by the fifth and fourteenth amendments, then, means process due according to the law of the land."

This extract from petitioners' brief is a quotation from the Encyclopedia of United States Supreme Court Reports, vol. 5, p. 508.

That a treaty made under the authority of the United States is a law of the land is unquestioned (Const. art. 6), and, quoting again from petitioners' brief:

"There is no doubt that a treaty, when self-executing, is equivalent to an act of Congress."

On this subject, the Supreme Court has said:

"A treaty that operates of itself without the aid of legislation is equivalent to an act of Congress, and while in force constitutes a part of the supreme law of the land. Foster v. Neilson, 2 Pet. 253, 314 [7 L. Ed. 415]." Chew Heong v. United States, 112 U. S. 540, 5 Sup. Ct. 256, 28 L. Ed. 770.

Petitioners, however, contend, that The Hague Treaty, relating to internment, is not self-executing. This position is untenable. 38 Cyc. 972. The treaty is full and complete, and no legislation is necessary to its enforcement. It is true, that Congress might have expressly designated some one for that purpose, but in the absence of such legislation, the duty devolves upon the President.

By section 1 of article 2 of the Constitution, the executive power is expressly vested in the President, and section 3, of the same article declares, "He shall take care that the laws be faithfully executed." This power with reference to the execution of treaty stipulations was expressly asserted in an opinion of the Attorney General, dated December 15, 1870, as follows:

"The Secretary is an officer of the executive department of the government. It is established by a long course of authoritative opinion and conforming

practice, that in many cases the executive of the United States can execute the stipulations of a treaty without provision by act of Congress. In some instances this has been done as a general executive duty, when the treaty itself pointed out no particular mode of execution. This was the course taken in the case of Thomas Nash, otherwise called Jonathan Robbins, who was delivered up by the direction of President Adams to the British authorities in execution of the treaty with Great Britain of 1794. An attempt to bring the censure of Congress upon the President for this act was encountered by an argument from Chief Justice Marshall, then a Representative from Virginia, which conclusively established the power." 13 Opinions of Attorneys General, 358.

From said argument I take the following extracts:

"The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations. Of consequence, the demand of a foreign nation can only be made on him.

"He possesses the whole executive power. He holds and directs the force of the nation. Of consequence, any act to be performed by the force of the nation is to be performed through him.

"He is charged to execute the laws. A treaty is declared to be a law. He must then execute a treaty, where he, and he alone, possesses the means of executing it.

"The treaty, which is a law, enjoins the performance of a particular object. The person who is to perform this object is marked out by the Constitution, since the person is named who conducts the foreign intercourse, and is to take care that the laws be faithfully executed. The means by which it is to be performed, the force of the nation, are in the hands of this person. Ought not this person to perform the object, although the particular mode of using the means has not been prescribed? Congress unquestionably may prescribe the mode, and Congress may devolve on others the whole execution of the contract; but, till this be done, it seems the duty of the executive department to execute the contract by any means it possesses."

Annals of Congress, 6th Congress, 1799—1801, p. 614.

This argument was made on March 7, 1800, and on the day following the House gave it unqualified indorsement, by rejecting, on a vote of 61 yeas to 35 nays, the resolution of censure. See, also, In re Neagel, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55.

Except in its statement of some general principles, about which there is no controversy, Ex parte Orozco, 201 Fed. 106, has no application here. The Hague Treaty, upon which the government justifies its detention of the petitioners herein, was not even referred to by the learned judge who decided the latter case. I agree with him that the power to deprive an individual of his liberty without due process of law has no existence in this country, but here "due process of law" is found in The Hague Treaty, its execution by the President, and the admitted facts which bring petitioners under its operation.

[2] Petitioners further contend that, as the government of the United States has not accorded official recognition to either party to the civil war in Mexico, neither of said parties is a nation, within the meaning of the international law, and therefore the principles of international law do not apply. These views, however, are unsustained by authority. On the contrary, the Supreme Court of the United States quotes with approval from Vattel, as follows:

"A civil war breaks the bands of society and government, or at least suspends their force and effect; it produces in the nation two independent par-

tics, who consider each other as enemies, and acknowledge no common judge. Those two parties, therefore, must necessarily be considered as constituting, at least for a time, two separate bodies, two distinct societies. Having no common superior to judge between them, they stand in precisely the same predicament as two nations who engage in a contest and have recourse to arms.

"This being the case, it is very evident that the common laws of war— those maxims of humanity, moderation, and honor—ought to be observed by both parties in every civil war. Should the sovereign conceive he has a right to hang up his prisoners as rebels, the opposite party will make reprisals, etc., the war will become cruel, horrible, and every day more destructive to the nation."

Prize Cases, 2 Black (67 U. S.) 667, 17 L. Ed. 459.

At page 669 of 2 Black (17 L. Ed. 459) of the same case, the court further says:

"It is not the less a civil war, with belligerent parties in hostile array, because it may be called an 'insurrection' by one side, and the insurgents be considered as rebels or traitors. It is not necessary that the independence of the revolted province or state be acknowledged in order to constitute it a party belligerent in a war according to the law of nations. Foreign nations acknowledge it as war by a declaration of neutrality. The condition of neutrality cannot exist unless there be two belligerent parties. In the case of the Santissima Trinidad, 7 Wheat. 337 [5 L. Ed. 454], this court say: 'The government of the United States has recognized the existence of a civil war between Spain and her colonies, and has avowed her determination to remain neutral between the parties. Each party is therefore deemed by us a belligerent nation, having, so far as concerns us, the sovereign rights of war."

Petitioners' contention, therefore, that Mexico, because of the civil war, is not subject to international law, or more specifically The Hague Treaty, is without merit.

My conclusions are: First, that the petitioners are completely within the provisions of chapter 2, art. 11, of The Hague Treaty; second, that said article violates no provision of the Constitution of the United States, requires no legislation to render it effective, and is accordingly the law of the land; and third, that the President has full authority, and it was and is his duty to execute said treaty provisions.

The writ and petition, therefore, will be dismissed, and petitioners remanded to the custody of the respondent.